*255 Opinion
MOSK, J.
The San Diego County District Attorney filed an amended information on January 20, 1987, charging defendant with three murders and other offenses. The information alleged that the crimes all occurred on or about April 26, 1985.
Count 1 charged defendant with murder in the death of Jose Luis Rositas (Pen. Code, § 187; all unlabeled statutory references are to this code). Counts 2 and 3 contained the same charge in the deaths of Marcos Antonio Zamora and Ernesto Dominguez Mendez respectively. Count 4 charged him with the attempted murder of Pedro Castillo (§§ 187, 664), and count 5 with robbing him (§ 211). Count 6, which the superior court later dismissed and which the jury did not consider, charged him with robbing Zamora. Counts 7, 8, and 9 charged him with the attempted robbery of Dominguez, Rositas, and Zamora respectively (§§211, 664). The first six counts were accompanied by allegations that defendant personally used a firearm (§ 12022.5).
The amended information alleged that defendant committed the special circumstances of multiple murder (§ 190.2, subd. (a)(3)) and murder in the attempted commission of robberies (§ 190.2, former subd. (a)(17)(i), now subd. (a)(17)(A)).
The amended information further alleged that defendant had been convicted of other offenses: of robbery in 1972, of burglary in 1975, and of possessing controlled narcotic substances for sale in 1982.
The case was called for trial on January 17, 1989. William Woodward and Gloria Michaels represented the People, and Barton C. Sheela III and Glorene Franco represented defendant. (Woodward would later withdraw to join the bench. See post, at p. 287.) On August 1, 1989, the jury convicted defendant of all the offenses charged but one: the attempted robbery of Rositas. (None of the determinate terms is at issue here.) The jury also found, with respect to counts 1 through 5 and count 8 (the latter having been renumbered from count 9 following dismissal of count 6 as described in the previous paragraph), that defendant had personally used a firearm within the meaning of section 12022.5. It further found the special circumstance allegations true. Defendant waived his right to have the prior offense allegations tried before a jury, and the court found them true. The parties stipulated before the jury that he had suffered the convictions.
The penalty phase began August 14, 1989. On August 31, the jury returned a verdict of death on counts 1, 2, and 3, and the court entered judgment in accordance with it. The appeal to this court is automatic.
*256 The Guilt Phase

Facts

The prosecution theorized that defendant herein, Hector Juan Ayala, his brother Ronaldo Medrano Ayala, and Jose Moreno murdered Dominguez, Rositas, and Zamora, after holding them captive in an automobile repair shop. (Moreno, tried under the name Joseph Juarez Moreno, was acquitted in a separate trial.) They would also have killed Castillo, but he improvised an escape plan and, though shot, survived to testify. Castillo provided the information that led to defendant’s arrest and served as the prosecution’s key witness at trial.
Opening statements and presentation of evidence began on May 30, 1989. San Diego Police Detective Richard Carey testified that on April 26, 1985, his homicide team was summoned to an automobile body repair shop located at 999 South Forty-third Street, between Logan and National Avenues in southeast San Diego. He found Dominguez’s, Zamora’s and Rositas’s bodies in the shop office. All had been shot. A forensic pathologist, Dr. David Masamichi Katsuyama, testified that each had died from two gunshots to the head.

Prosecution Case

The prosecution theorized that the murders resulted from a robbery attempt that failed because it was based on the perpetrators’ incorrect speculation that Dominguez had just returned from Mexico with a quantity of narcotics or cash.
Juan Manuel Meza testified that about a month before the killings Ronaldo Ayala, in the presence of Meza and defendant, proposed to rob the automobile body shop. Thereafter, Meza attended a meeting that defendant had called at his house. Defendant emerged from the bedroom displaying a .38-caliber Smith & Wesson revolver in poor condition. He or Ronaldo Ayala asked Meza if they could use some of Meza’s guns, which were of better quality, for the impending robbery of “a large quantity of drugs” that defendant said Dominguez was then obtaining “from the other side of the border.” (Meza testified that he owned a variety of firearms: a .45-caliber, .357-caliber and .380-caliber, all presumably pistols; a 30-30, a 30-06, and an AR-15 rifle; and an Uzi.) The three discussed a plan for the crime, in which they would tie up the victims and wait for Dominguez’s wife to arrive in an orange van with the drugs during that evening. The victims were all to be killed.
*257 Castillo was Dominguez’s employee. He testified that Dominguez and Zamora, who was Dominguez’s brother-in-law, ran a heroin distribution business at the shop. Castillo helped to prepare, package, and deliver heroin. Defendant was also a heroin user.
Castillo testified that a week before the killings he spoke with defendant about Dominguez’s whereabouts. Dominguez was in jail, apparently for minor offenses. But Dominguez told Castillo to tell anybody asking that he was in Mexico, and Castillo so told defendant. Defendant did not believe Castillo, so Castillo told the truth. But defendant appeared skeptical of that information also, so Castillo reverted to his story that Dominguez was traveling south of the border.
About noon on the day of the killings, Castillo injected a dose of heroin off the premises and returned to work at the shop. The drug had a stabilizing effect on Castillo, who also testified that using it that day did not impair his ability to work.
About 5:00 p.m. Castillo, defendant, Ronaldo Ayala, Moreno, and Dominguez were all present on the premises. Later, around dusk, Castillo looked up and saw defendant pointing a pistol at him. He escorted him to the office at gunpoint, where Ronaldo Ayala, also armed with a gun, was holding Dominguez, Zamora, and Rositas captive. They had all been bound with duct tape.
Defendant said to Dominguez something like, “Didn’t you know you had to go through us?”
Moreno then bound Castillo’s hands behind his back with duct tape. When Moreno was taping him he tried to shift his hands so as to keep them as free as possible.
Ronaldo Ayala announced that he “[wjanted $10,000 or someone was going to die,” Castillo further testified. Dominguez responded, “Hey, homeboy, nunca te h[e] hecho nada [I’ve never done anything to you].” Apparently nobody had $10,000, but Castillo volunteered that he had hidden some money under the driver’s seat of a tow truck parked outside—a ruse, as he had money only in his pocket. At that time, defendant extracted the pocket money, accused Castillo of lying, and stabbed him in the upper left leg.
Moreno left to inspect the tow truck. On his return, he informed his accomplices that the truck contained no money. Ronaldo Ayala urged that Castillo be taken out to get the money, but defendant, speaking to Castillo, *258 said he preferred to “blow you away.” Castillo responded, “Gosh, it’s there, homeboy. . . . It’s in the truck. I just put it there.”
Ronaldo Ayala shoved defendant and quieted him. Then, with a gun in one hand, he began to escort Castillo outside, holding him by his jacket with the other hand and warning him that if he tried to run when the garage door opened—precisely Castillo’s plan—he would kill him.
Ronaldo Ayala told Moreno to open the garage door slowly, and Castillo feigned that he was trying to squeeze under it, but could not do so. In fact his feint was disguising the fact that he was propping the door up with his body. Unknown to the assailants, the door was defective, and would slam down unless supported. Once Moreno had raised it far enough for Castillo to escape, and also had relaxed his own hold on the door (which Castillo could sense by the door’s weight on him), Castillo bolted underneath, and the door slammed down, surprising Ronaldo Ayala and Moreno.
Still bound at the hands, Castillo ran toward the street. Ronaldo Ayala and Moreno managed to open the garage door, and a shot was fired at Castillo, wounding him in the back. He fell onto South Forty-third Street. As he lay in the street he heard more shots. Then he saw a police car come into view, and the police took control of the scene.
Castillo acknowledged that he had testified falsely on prior occasions with respect to heroin-related activity at the body shop, denying any knowledge that Dominguez or Zamora sold the drug. He testified at trial that he did this for the sake of the murder victims’ families: he did not want to taint their memories of the dead. He also testified that he never returned to using heroin or methadone after the killings. “I didn’t need it no more” because “I accepted the Lord as my savior” some eight months later.
There was testimony that defendant’s fingerprints had been found on items recovered from the body shop office. (See post, at p. 278.)
A police officer, Tony D. McElroy, testified that he found Castillo in the street and discovered bodies inside the automobile body shop. He questioned Castillo, who told him that the perpetrators were three Mexicans. One, he told Officer McElroy, was wearing a red Pendleton-type jacket. Before describing anyone else he said he only wanted to answer further questions with a lawyer present.

Defense Case

Defendant did not testify at the guilt phase. But the defense theory was that third parties were responsible for the murders: either two young Latino *259 men, one of whom was wearing a Pendleton-style shirt or jacket, or men who lived behind the body shop and who were also merchandising drugs. And Castillo was in league with them, and testified against defendant to turn suspicion away from the real killers, who might otherwise exact revenge against him.
Regarding the first theory: Traci Lynn Pittman testified that on the night of the murders she was at a liquor store across South Forty-third Street. She saw two Hispanic men walk from that liquor store to the complex containing the automobile body shop and disappear into it. One wore a red-and-black plaid Pendleton-style shirt or jacket. As they passed her she noticed that one appeared to be concealing a bulky object, which could have been a gun. Neither looked the same as defendant. The lighting at the scene was poor and she could not see where they went. But a minute or two later a man (evidently Castillo) emerged running from the complex and fell onto South Forty-third Street as shots rang out. Pittman took shelter in the liquor store.
As mentioned, the other defense theory was that men living behind the automobile body shop, themselves drug dealers, had committed the murders. There was testimony that Hector Antonio Figueroa Hernandez, known by his nickname “Tony,” and Eduardo “Lalo” Sanchez lived in that locale. Figueroa moved there about four days after the killings. After Figueroa moved in, Sanchez’s uncle saw him and Sanchez wearing guns at the waist. Sanchez had a .22-caliber gun, and Figueroa had a .38. It appeared, from sudden increases in household wealth and unusual activity, that Sanchez and Figueroa had begun a drug-dealing business. Sanchez’s uncle reported his suspicions to the police.
Issues on Appeal
I. Jury Selection Issues
Defendant exhausted all of his peremptory challenges and expressed dissatisfaction with the jury as sworn. He raises several claims regarding jury selection. As we will explain, the trial court erred in permitting the prosecutor to explain ex parte and outside defendant’s presence his reasons for peremptorily challenging certain prospective jurors. But the error was harmless.
A. Holding Ex Parte Hearings on Reasons for Peremptory Challenges
Three times, and with respect to seven prospective jurors, defendant argued that the prosecutor was exercising peremptory challenges to jury *260 panelists on the basis of their race or ethnicity. Such an action would, of course, be improper. (People v. Wheeler (1978) 22 Cal.3d 258, 276-277 [148 Cal.Rptr. 890, 583 P.2d 748]; Batson v. Kentucky (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69].)
The trial court asked the prosecution to explain its reasons for the challenges. After the prosecutor said he did not wish to reveal his strategy, the court declared that it planned to hold an ex parte hearing from which defendant and his counsel would be excluded. Defense counsel stated that he had no objection to being excluded from discussions of strategy, but that “I think I am entitled to be présent” otherwise, in case the prosecution’s “statement is a misstatement of the facts” and to “make sure the record is clear as to what the statement of facts is.” The court held three ex parte hearings, and ruled each time that the prosecutor was not challenging jury panelists because of race or ethnicity. At issue here is the propriety of the hearings at which the court reached its decisions.
“Under Wheeler, there is a presumption that a prosecutor uses his peremptory challenges in a constitutional manner. [Citation.] The defendant bears the burden to show, prima facie, the presence of purposeful discrimination. [Citation.] If he succeeds, the burden shifts to the prosecutor to show its absence.” (People v. Alvarez (1996) 14 Cal.4th 155, 193 [58 Cal.Rptr.2d 385, 926 P.2d 365].)
The details of the procedure for conducting an inquiry on a claim of improper group bias against prospective jurors are well known. In the first step of the three-part Wheeler inquiry, “ 6 “[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, ... he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all tjie circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association . . . (People v. Box (2000) 23 Cal.4th 1153, 1187-1188 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Next, the burden shifts to the challenged party to provide a race-neutral explanation for the exercise of peremptory challenges. (People v. Hayes (1999) 21 Cal.4th 1211, 1284 [91 Cal.Rptr.2d 211, 989 P.2d 645].) At the third step of the Wheeler challenge process—the determination by the trial court whether the opponent of the peremptory challenge has proved purposeful racial discrimination— the trial court must consider at least two possibilities. If the prosecutor *261 acknowledges that he challenged a prospective juror for an impermissible reason (see U.S. v. Thompson (9th Cir. 1987) 827 F.2d 1254, 1256, fn. 1), then, of course, the Wheeler motion must be granted. If the prosecutor does not so state, but instead offers the court race-neutral reasons, it must still determine whether those stated reasons are untrue and pretextual. (People v. Alvarez, supra, 14 Cal.4th 155, 196.)
Provided that the inquiry proceeds within the general framework just articulated, no particular procedures are constitutionally required. As the United States Supreme Court said of Batson hearings, “It. remains for the trial courts to develop rules, without unnecessary disruption of the jury selection process, to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice.” (Powers v. Ohio (1991) 499 U.S. 400, 416 [111 S.Ct. 1364, 1374, 113 L.Ed.2d 411].) “The response of courts across the country has created a rather wide spectrum, ranging from those that recommend an adversary proceeding of some type to those that permit the prosecutor’s explanation to be received in camera and ex parte.” (Gray v. State (1989) 317 Md. 250, 257 [562 A.2d 1278, 1281].)
Preliminarily, we review for an abuse of discretion the trial court’s implicit rulings that the prosecution presented matters of strategy that justified ex parte hearings during challenges on Wheeler grounds.
At the end of the first ex parte hearing, the trial court implied, and implicitly found, that the prosecutor had “divulge[d] certainly to some extent prosecution strategy in terms of jury selection.” During the second and third hearings, the court impliedly so ruled again, ordering, without prompting from the prosecutor, that the proceedings be sealed.
In the first and second hearings, the prosecutor said that he was disposed to challenge prospective jurors who were unable to express themselves well, or who appeared to be “nonconformist.” (See People v. Wheeler, supra, 22 Cal.3d 258, 275 [peremptory challenge may be exercised against one whose “clothes or hair length suggest an unconventional lifestyle”].) In sum, he was simply giving the reasons for his challenges, reasons that defendant was entitled to hear and that disclosed no secrets of trial strategy. It was unreasonable to exclude defendant from those hearings.
At the third hearing, the prosecution mentioned its 10-point rating system for prospective jurors, a rating given by a three-persoh committee including a psychologist, and the prosecutor discussed individual committee members’ ratings of various prospective jurors. Even so, he was not divulging strategic information that defendant could use to his advantage at trial—he was *262 merely describing the prosecution’s system of jury selection, a process to which defendant was a passive bystander.
Given that no matters of trial strategy were revealed, we conclude that the court abused its discretion in implicitly or explicitly ruling that they were.
The next question is whether it was error to exclude defendant from participating in the hearings on his Wheeler motions. We conclude that, as a matter of state law, it was.
As a general matter, ex parte proceedings are disfavored. (See generally NBC Subsidiary (KNBC-TV), Inc. v. Superior Court (1999) 20 Cal.4th 1178 [86 Cal.Rptr.2d 778, 980 P.2d 337] [excluding public from proceedings]; People v. Wright (1990) 52 Cal.3d 367, 402 [276 Cal.Rptr. 731, 802 P.2d 221] [ex parte communications with jurors]; People v. Beeler (1995) 9 Cal.4th 953, 1014 [39 Cal.Rptr.2d 607, 891 P.2d 153] (cone, and dis. opn. of Kennard, J.).) “Two basic defects are typical of ex parte proceedings. The first is a shortage of factual and legal contentions. Not only are facts and law from the defendant lacking, but the moving party’s own presentation is often abbreviated because no challenge from the defendant is anticipated at this point in the proceeding. The deficiency is frequently crucial, as reasonably adequate factual and legal contentions from diverse perspectives can be essential to the court’s initial decision . . . .” (United Farm Workers of America v. Superior Court (1975) 14 Cal.3d 902, 908 [122 Cal.Rptr. 877, 537 P.2d 1237].)
Ex parte proceedings following a Wheeler motion may create similar problems and, in the main, it is error to conduct them. “In the rare case in which the explanation for a challenge would entail confidential communications or reveal trial strategy, an in camera discussion can be arranged.” (Georgia v. McCollum (1992) 505 U.S. 42, 58 [112 S.Ct. 2348, 2358, 120 L.Ed.2d 33].) This, however, is not such a case.
The question whether ex parte communications are proper in ruling on a Wheeler motion has not arisen in California decisional law. But the same or closely related issues have arisen in federal and other state cases discussing analogous motions brought under Batson v. Kentucky, supra, 476 U.S. 79. While some decisions have tolerated an ex parte Batson hearing procedure on the ground that the United States Constitution permits it (U.S. v. Tucker (7th Cir. 1988) 836 F.2d 334, 340; U.S. v. Davis (6th Cir. 1987) 809 F.2d 1194, 1202), it seems to be almost universally recognized that ex parte proceedings following a motion regarding peremptory challenges allegedly made on the basis of improper group bias are poor procedure and should not *263 be conducted unless compelling reasons justify them. (People v. Hameed (1996) 88 N.Y.2d 232, 237-238 [644 N.Y.S.2d 466, 469, 666 N.E.2d 1339, 1342]; U.S. v. Roan Eagle (8th Cir. 1989) 867 F.2d 436, 441; Gray v. State, supra, 317 Md. 250, 257-258 [562 A.2d 1278, 1282]; U.S. v. Tindle (4th Cir. 1988) 860 F.2d 125, 132-133 (conc. & dis. opn. of Murnaghan, J.); U.S. v. Garrison (4th Cir. 1988) 849 F.2d 103, 106; U.S. v. Tucker, supra, 836 F.2d at p. 340; U.S. v. Gordon (11th Cir. 1987) 817 F.2d 1538; Goode v. Shoukfeh (Tex. 1997) 943 S.W.2d 441, 452 [civil case].) We agree.
U.S. v. Thompson, supra, 827 F.2d 1254, presented the issue and the countervailing values involved: “The question presented to us is . . . whether the district judge erred by permitting the [prosecutor] to state her reasons to him ex parte and then ruling on the objection without divulging the reasons to defense counsel. In resolving this issue we must consider and reconcile two fundamental principles of our criminal justice system. The first is that the district judge has broad discretion to fashion and guide the procedures to be followed in cases before him. [Citations.] The second principle is that adversary proceedings are the norm in our system of criminal justice, [citation], and ex parte proceedings the disfavored exception.” (Id. at p. 1257.)
U.S. v. Thompson, supra, 827 F.2d 1254, further explained: “The right of a criminal defendant to an adversary proceeding is fundamental to our system of justice. [Citations.] This includes the right to be personally present and to be represented by counsel at critical stages during the course of the prosecution. [Citation.] This is not mere idle formalism. Our system is grounded on the notion that truth will most likely be served if the decision-maker—judge or jury—has the benefit of forceful argument by both sides. . . .
“There are, to be sure, occasional departures from this norm. The district judge makes an ex parte review of the prosecution’s evidence to determine whether it falls within the rule of Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). [Citations.] Also, the district judge normally considers on an ex parte basis whether to reveal to the defense the identity of a government informant. [Citation.] But, as these examples illustrate, situations where the court acts with the benefit of only one side’s presentation are uneasy compromises with some overriding necessity, such as the need to act quickly or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema in our system of justice and . . . may amount to a denial of due process.” (U.S. v. Thompson, supra, 827 F.2d 1254, 1258-1259, fn. omitted.)
In addition to the foregoing general considerations, it is error in particular to conduct ex parte proceedings on a Wheeler motion because of the risk that *264 defendant’s inability to rebut the prosecution’s stated reasons will leave the record incomplete. We discuss this problem post, at page 267.
We turn to the question of prejudice. We have concluded that error occurred under state law, and we have noted Thompson's suggestion that excluding the defense from a Wheeler-type hearing may amount to a denial of due process. We nonetheless conclude that the error was harmless under state law (People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), and that, if federal error occurred, it, too, was harmless beyond a reasonable doubt (Chapman v. California (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]) as a matter of federal law. On the record before us, we are confident that the challenged jurors were excluded for proper, race-neutral reasons.
As mentioned, the ex parte hearings pertained to seven prospective jurors. With respect to Glanders D., the prosecutor stated he had exercised the challenge in part because his questionnaire indicated he opposed the death penalty. The prosecutor acknowledged Glanders D.’s oral statements that his views had changed, but commented that his answers were “not totally responsive to the questions of either counsel for the defense or myself.” He further stated, in essence, that Glanders D.’s difficulties in communicating led him to question whether he would “fit in” on the jury. The court disagreed with the latter point, noting, “it may well be that he would get along very well with 12 people,” but added: “I think the other observations of counsel are accurate and borne out by the record.”
In the ex parte discussion of Galileo S., the prosecutor indicated that on Hovey voir dire (Hovey v. Superior Court (1980) 28 Cal.3d 1, 80-81 [168 Cal.Rptr. 128, 616 P.2d 1301]) to determine his attitudes toward the death penalty, the prospective juror showed that he was a “nonconformist person who has had numerous run-ins with the law. We determined through his rap sheets that he has three or four more arrests other than those that he has told us about.” Moreover, the prosecutor also asserted that “his attitude is such that I think it would create alienation and hostility on the part of the other jurors.” The trial court agreed, commenting on Galileo S.’s “paranoia . . . concerning the justice system.”[1]
With respect to Barbara S., the prosecutor said that he had assigned her a rating of zero on the prosecution team’s 10-point scale, and that the other *265 two reviewers had given her a three and a six. “During the questioning process ... I very quickly formed the opinion that there was something wrong with [Barbara S.]. Her responses were extremely slow, and I began to suspect that she was possibly under the influence of drugs. [1Q . . . [S]he had ... an empty look in her eyes, ... a lack of really being totally in tune with what was going on.” He noted further that her “answers did not make sense, that they did not relate to the questions presented.” He also commented that Barbara S. appeared “somewhat angry” when she initially came into court. The trial court disagreed with the last point, interpreting her demeanor as reflecting nervousness rather than hostility. But it concluded that overall it “certainly [could not] quarrel” with the prosecutor’s impressions of Barbara S. or with the peremptory challenge based on her individual characteristics.
With respect to Gerardo O., the prosecutor cited in justification of his excusal his difficulties in writing, understanding and reading English. He also mentioned his idiosyncratic dress and demeanor, his evident aloofness from other prospective jurors, and his inability to articulate any opinion about the death penalty. The trial court noted that the record supported the prosecutor’s assessment of Gerardo O.’s responses.[2]
The prosecutor justified his challenge of George S. on the ground he had served on a jury once before and was the holdout juror, which made the prosecutor feel “extremely uneasy.” On the prosecution evaluation committee’s 10-point scale, the prosecutor had rated George S. about one; the other two members had rated him at one and two. The prosecutor mentioned he thought George S. was Greek (as his surname might suggest), rather than Hispanic, as the defense implied in making the Wheeler motion, “but I wasn’t paying attention to the racial aspect of the case.” The prosecutor offered additional reasons for the challenge: George S. had once applied to be a police officer but was rejected, and the prosecutor feared it might have been for psychological reasons. Further, the prosecutor expressed unease with his Hovey voir dire responses. (Hovey v. Superior Court, supra, 28 Cal.3d 1, 80-81.) The trial court confirmed the accuracy of the prosecutor’s observations.
With respect to Luis M., the prosecutor explained he exercised the challenge because the prospective juror was leery of the death penalty and *266 because he had investigated the case on his own, prior to Hovey voir dire. Luis M. had stated: “In my neighborhood . . . some people happen to know the accused, and I just questioned a couple of people [about] the character of the [defendant].” Luis M. had also made inquiries regarding the facts of the case. The court stated that the peremptory challenge was proper.
With respect to Robert M., the prosecutor reminded the trial court that he had passed on challenges to the jury at one point, leaving Robert M. seated. He stated he had rated Robert M. between a four and a five, while the other prosecutorial reviewers had assigned him ratings of four and five, respectively. He explained that he had determined, before beginning the selection process, that he would prefer not to have jurors who scored five or less, and that he ultimately exercised the challenge because he was skeptical Robert M. could impose the death penalty. The court noted that although Robert M.’s questionnaire indicated he favored the death penalty, his voir dire answers varied to an extent that one might entertain a legitimate concern whether he could impose it, and it agreed that was an appropriate reason for a peremptory challenge.
In summary, the record reveals the following facts in support of the view that the prosecutor was not engaged in racial or ethnic discrimination. The court credited the prosecutor’s opinions that Glanders D. opposed the death penalty, that Barbara S. was in a dazed state, that George S. had been a holdout juror and had been rejected for a law enforcement position, and that Robert M. was less than desirable from the prosecution’s point of view. Galileo S., among other deficiencies, had (unless the prosecutor was misleading the court) not been honest regarding his criminal past. Luis M. admitted that he had investigated the case. Gerardo O. struggled with English and did not' understand the proceedings.. A prosecution committee, including a psychologist, gave Barbara S., George S., and Robert M. poor or mediocre suitability ratings. George S.’s surname is not obviously Spanish, and the prosecutor stated that he was unaware of his Hispanic heritage.
On these facts, we are confident that the prosecutor was not violating Wheeler, and that defense counsel’s presence could not have affected the outcome of the Wheeler hearings.[3] Moreover, the trial court’s rulings in the ex parte hearing indisputably reflect both its familiarity with the record of *267 voir dire of the challenged prospective jurors and its critical assessment of the prosecutor’s proffered justifications. To the extent the rulings expressed agreement with the prosecutor’s characterizations of the prospective jurors and their responses, they also support the court’s implicit conclusion that the prosecutor did not fabricate his justifications and they were grounded in fact.
Defendant argues that the court’s error in holding the Wheeler hearings ex parte was prejudicial because his lack of opportunity to rebut the prosecution’s justifications for the challenges resulted in an incomplete record. We have agreed that such a result is theoretically possible. It is a reason for our conclusion that holding an ex parte hearing on a Wheeler motion ordinarily is state law error.
In particular, defendant maintains that a prosecutor might offer a reason unanticipated by the defense that sounds neutral, but in fact is untrue. His point is this: he is required, in making his prima facie case, to try to anticipate all the justifications the prosecutor may have for peremptorily challenging the prospective juror. But there are some he simply may not be able to anticipate. For example, the prosecutor might declare that he challenged a prospective juror because he silently mouthed an obscenity toward the prosecution table during voir dire. Defense counsel might not have noticed that act. But having been apprised of it, they could point out that other unchallenged prospective jurors did the same thing, that the prosecutor saw them do it, that those prospective jurors were not in a protected group, and that he did not peremptorily challenge them. (Accord, U.S. v. Thompson, supra, 827 F.2d 1254, 1260.)
Although such a possibility exists in the abstract, nothing suggests that something similar occurred here. Rather, the trial court heard the criteria the prosecutor articulated—criteria furnishing reasons for the challenges that were, at a minimum, plausible, and that the record often supports—and expressly agreed that each of the excusáis was proper. It impliedly found the prosecutor’s stated justifications to be honest. We will not reverse the judgment on the basis of speculation regarding theoretical possibilities of the type discussed above.
A second concern, voiced by the Thompson majority, was that a prosecutor might offer a reason that is legally improper—i.e., the product of impermissible group bias—but that the trial court overlooks. (U.S. v. Thompson, supra, 827 F.2d 1254, 1260.) That was the case in People v. Snow *268 (1987) 44 Cal.3d 216 [242 Cal.Rptr. 477, 746 P.2d 452], in which the trial court admitted that it was unfamiliar with Wheeler (Snow, supra, 44 Cal.3d at pp. 224, 226) even though “[v]oir dire occurred . . . several years after Wheeler was filed.” (Id. at p. 224.) In this case, however, the court was thoroughly familiar with Wheeler and the requirements that case imposed. We have now reviewed the records of two cases tried by this superior court judge in respect of the same crimes: defendant’s and Ronaldo Ayala’s (People v. Ayala (2000) 23 Cal.4th 225 [96 Cal.Rptr.2d 682, 1 P.3d 3]). In both, the trial judge showed himself to be in command of the law and the facts. He was diligent, prepared, knowledgeable, and engaged in the- proceedings, including those relating to defendant’s Wheeler motion. The concern voiced in Thompson, though real in the abstract and bearing fruit in People v. Snow, supra, 44 Cal.3d 216, is of no moment in this case.
U.S. v. Thompson, supra, 827 F.2d 1254, is distinguishable in additional respects from this case. First, the Thompson majority, observing that all it had before it concerning the propriety of the challenges was the prosecutor’s explanation of her reasons and the district judge’s ruling, professed itself unable to place confidence in the latter in the face of the record’s “[un]reassuring” “silence.” (Id. at p. 1261.) Here, by contrast, the record, even if not as complete as it might have been had defendant participated in the ex parte hearings, is well developed. In particular, the trial court’s remarks constitute a valuable assessment of the prosecutor’s justifications. Second, the Thompson majority noted that in attempting to justify one of her challenges, the prosecutor cited the fact that the prospective juror and defendant were both Black. (Id. at p. 1260; see id. at p. 1256, fn. 1.) As the Thompson majority correctly observed, “the fact that the potential juror might identify too much with the defendant because they are of the same race is precisely what Batson said [is] not legitimate.” (Id. at p. 1260.) A reviewing court might well entertain a reasonable doubt regarding the propriety of the challenge on such a record. But nothing comparable appears in the record before us.
In sum, when a trial court decides to hold a Wheeler hearing, it is possible, in the abstract, that the defense’s contribution might make a difference in the ultimate ruling, which is why Wheeler hearings generally should be adversarial. On this well-developed record, however, we are confident that defense counsel could not have argued anything substantial that would have changed the court’s rulings. Accordingly, the error was harmless.
Defendant also contends that the error violated his rights to be present and to be represented by counsel as guaranteed by the state and federal Constitutions and by California statutory law. (See U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; Pen. Code, §§ 977, subd. (b), 1043, subd. *269 (a); People v. Waidla (2000) 22 Cal.4th 690, 741-742 [94 Cal.Rptr.2d 396, 996 P.2d 46].) And he claims violations of rights under the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution. We need not address these contentions in detail, for our analysis shows that the erroneous exclusion of the defense from the Wheeler hearing was harmless beyond a reasonable doubt under the federal constitutional standard of Chapman v. California, supra, 386 U.S. 18, 24 [87 S.Ct. 824, 828], and.also harmless under the state law standard of People v. Watson, supra, 46 Cal.2d 818, 836. (Cf. Rushen v. Spain (1983) 464 U.S. 114, 118-119 [104 S.Ct. 453, 455-456, 78 L.Ed.2d 267] (per curiam) [assuming the trial court’s erroneous ex parte communications with juror implicated the defendant’s federal constitutional rights to presence and to counsel, the error was harmless]; People v. Wright, supra, 52 Cal.3d 367, 402-403 [same]; People v. Hogan (1982) 31 Cal.3d 815, 849-850 [183 Cal.Rptr. 817, 647 P.2d 93] (lead opn.), disapproved on another ground in People v. Cooper (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865] [temporary absence of counsel during jury deliberations assessed under harmless error standard]; People v. Knighten (1980) 105 Cal.App.3d 128, 132-133 [164 Cal.Rptr. 96] [same].)
B. Challenge Regarding Rights of Excluded Prospective Jurors
In tandem with his Wheeler claim, defendant also maintains that the ex parte proceedings make it impossible to determine whether race-based exclusion may have occurred, to the detriment of prospective jurors who enjoy a right under the equal protection clause not to be discriminated against in jury selection on the basis of race. (Powers v. Ohio, supra, 499 U.S. 400, 409 [111 S.Ct. 1364, 1369-1370].) Again, on the record before us, we are confident that no such exclusion occurred. The prosecutor articulated, at a minimum, plausible criteria for his excusáis, the trial court agreed that the excusáis were proper, and to the extent the written record before us touches on the prosecutor’s stated reasons, it confirms that they were not pretextual.
C. Loss of Certain Prospective Jurors’Questionnaires
Defendant claims that his constitutional right to a meaningful review of his conviction and sentence has been infringed by the loss of the bulk of prospective juror questionnaires. The questionnaires of the seated jurors and alternates were preserved, but almost all others have been lost.
As a general matter, we disagree. We addressed, and rejected, a similar claim in People v. Alvarez, supra, 14 Cal.4th 155, where we said: “[D]efendant maintains that his Wheeler[-\Batson claim must be resolved in his favor *270 on the ground that the record on appeal is not adequate to permit meaningful review. The deficiency of which he complains is the absence of certain questionnaires, which were completed by prospective jurors, then lodged with the superior court, subsequently lost by its clerk’s office, and finally determined by the superior court to be beyond reconstruction. A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law. [Citation.] It is true as well under the United States Constitution—under the Fourteenth Amendment generally, and under the Eighth Amendment specifically when a sentence of death is involved. [Citation.] The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant’s ability to prosecute his appeal.” (Id. at p. 196, fn. 8.)
With regard to the prospective jurors whose questionnaires were lost but who are not identified by defendant as the subject of Wheeler challenges, this court will not in any event compare the views of those jurors excused by peremptory challenges with those who were not excused on that basis. (People v. Jackson (1996) 13 Cal.4th 1164, 1197 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; cf. id. at pp. 1248-1249 (cone. opn. of Mosk, J.) [urging a contrary approach].) Under this court’s precedent, therefore, the loss of the questionnaires could not have prejudiced him. With regard to the prospective jurors whose questionnaires were lost and who were the subject of Wheeler challenges, we have already explained that the record is sufficiently complete for us to be able to conclude that they were not challenged and excused on the basis of forbidden group bias. Thus, even if there was federal error, it was harmless beyond a reasonable doubt (Chapman v. California, supra, 386 U.S. 18, 24 [87 S.Ct. 824, 828]), and under state law any error also was harmless (People v. Watson, supra, 46 Cal.2d 818, 836).
D. Denying Motions to Discharge the Jury Panel and Certain Prospective Jurors for Cause or Continue the Trial Because of News Accounts
Defendant’s brother Ronaldo Ayala was tried shortly before defendant for crimes arising from the same events. In the aftermath of news coverage of the death sentence imposed on Ronaldo Ayala, defendant moved either to dismiss the jury panel or to continue the trial until the coverage’s effects had lessened. He also moved to excuse certain prospective jurors for cause, namely their exposure to the coverage. The trial court denied his motions, and he claims error as a result.
The People contend that defendant failed to preserve his claim for review, to the extent his motion sought discharge of the jury panel, because the trial *271 court denied the motion as premature without prejudice, pending voir dire, and he failed to renew it afterward. The question is close, but we disagree. The People are correct that the court denied the motion to discharge the panel as premature. It appears, however, that the court may have reiterated its prior denial of the motion to discharge the panel at the point at which defendant moved to be equipped with additional peremptory challenges—in other words, when jury selection was well underway. At least implicitly, the court finally denied the motion. We will proceed to decide the matter on the merits.
Doing so, we observe that there was no need to discharge the jury panel unless, after the jury was selected, jurors were sworn who, because of their knowledge of the trial or sentence, or both, of Ronaldo Ayala, could not be fair in defendant’s case. (See People v. Pride (1992) 3 Cal.4th 195, 228-229 [10 Cal.Rptr.2d 636, 833 P.2d 643].) Near the end of jury selection, the trial court stated that it had excused for cause “any juror[s] that showed a slight leaning that [knowledge of Ronaldo Ayala’s case] might well impact their ability to be fair to [defendant] . . . .” The parties agree that defendant challenged 36 panelists for cause on the basis of their knowledge of the Ronaldo Ayala case, and that of those, 13 were excused, leaving 23. Defendant acknowledges that those 23 prospective jurors agreed that their knowledge of the Ronaldo Ayala case would not affect their ability to try his fairly. He claims, however, that the opposite must be true because Ronaldo Ayala’s death sentence was reported on television and in the newspapers, and the prospective jurors were exposed to the information.
That, however, is not enough. Defendant’s claim is purely speculative. He acknowledges that the panelists testified that they would not be improperly affected by their knowledge of the sentence in Ronaldo Ayala’s case. He produces no evidence to support his claim that the jury panel was irremediably tainted by exposure to Ronaldo Ayala’s case and should have been excused. For the same reason, his argument that his motion to continue the case should have been granted is without merit.[4]
Defendant next contends that eight prospective jurors should have been removed for cause because they could not be fair and impartial.
“Either party may challenge an individual juror for ‘an actual bias.’ [Citation.] ‘Actual bias’ in this context is defined as ‘the existence of a state of mind on the part of the juror in reference to the case, or to any of the *272 parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.’ [Citations.] A sitting, juror’s actual bias that would have supported a challenge for cause also renders the juror unable to perform his or her duties and thus subject to discharge. [Citation.] ‘Grounds for . . . discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists.’ [Citation.] The term ‘actual bias’ may include a state of mind resulting from a juror’s actually being influenced by extraneous information about a party.” (People v. Nesler (1997) 16 Cal.4th 561, 581 [66 Cal.Rptr.2d 454, 941 P.2d 87] (lead opn.).)
“ ‘On review, if the juror’s statements are equivocal or conflicting, the trial court’s determination of the juror’s state of mind is binding. If there is no inconsistency, we will uphold the court’s ruling if it is supported by substantial evidence. [Citations.]’ [Citation.] A juror’s bias need not ‘be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the .juror.’ ” (People v. Carpenter (1999) 21 Cal.4th 1016, 1035 [90 Cal.Rptr.2d 607, 988 P.2d 531].)
We turn to the specific prospective jurors to whom defendant refers.
Charles G. had read a newspaper article about the killings in 1985 when they occurred, and was vaguely aware that another man, whose name he could not recall, had recently been sentenced to death as a result. He denied that he would be influenced by Ronaldo Ayala’s sentence; rather, it was possible that “two people might be accused and only one of them is guilty.” Acknowledging that defendant might prefer jurors who were “absolutely . . . ignorant of the situation,” he testified that he could be fair and impartial. “I’d only judge by the trial that I’m on.”
The trial court ruled that Charles G. could be impartial despite his awareness of Ronaldo Ayala’s case. The record supports its ruling. There was no error in denying the challenge for cause.
Lois B. testified on voir dire that she worked at home and would keep the television on in the background. By that means she might have heard something about the case, but she did not pay attention to it. She thought that defendant’s brother might have been convicted of crimes, but was not sure. She stated in essence that this fleeting exposure would not affect her ability to be impartial.
*273 Defense counsel challenged Lois B. as an afterthought, and only because “[i]t’s my intention to challenge any juror who has knowledge of Ronaldo Ayala’s case.” Her challenge was so perfunctory that the trial court did not explicitly rule on it. But it told the prospective juror to await further instructions, and so implicitly denied it. The record supports its implicit ruling. There was no error in denying the challenge for cause.
Charles C. testified on voir dire that he had what may be characterized as an extremely vague recollection that there might have been another trial arising from the killings and that someone may have been convicted. He testified that “my knowledge is so hazy that I’m not going to rely on it.”
The trial court ruled that Charles C.’s knowledge of the case was trifling and that he could be impartial. The record supports its ruling. There was no error in denying the challenge for cause.
Catherine S. had only the faintest memory of Ronaldo Ayala’s case. She recalled reading or hearing that another criminal defendant with the same last name had been convicted of something, but knew nothing more and knew nothing about the Ronaldo Ayala proceedings or outcome. The trial court denied without comment defendant’s challenge for cause, which was based as much on counsel’s suspicion that “I’m not sure she’s been entirely candid” as on what she said on voir dire.
On this record, we see no evidence that Catherine S.’s vague awareness of Ronaldo Ayala’s trial affected her impartiality. The court’s ruling was proper.
Dwight S. testified that he experienced a “bit of exposure” to the legal consequences of the murders when he saw a newspaper headline about Ronaldo Ayala’s sentence. He did not read the accompanying article. After completing his questionnaire, he realized that defendant might be Ronaldo Ayala’s brother. He testified that he assumed the evidence in the two cases must be different, or the two would have been tried jointly, and that Ronaldo Ayala’s sentence would not affect his ability to be impartial. The trial court denied defendant’s challenge for cause, commenting that Dwight S. “would make his decision based upon the evidence as it comes in this case.”
The record supports the trial court’s observation. There was no error in denying the challenge for cause.
Robert K.’s exposure to publicity was the same as Dwight S.’s. But as in Dwight S.’s case, Robert K.’s answers on voir dire made clear that he would *274 not prejudge the case against defendant. In the abstract, he opined, “one brother can intimidate another brother to come along with him ... or they both can be willing participants.” (Indeed, portraying defendant as the deferential follower of Ronaldo Ayala was part of the defense strategy at the penalty phase.) He insisted that he could be impartial. The trial court denied defendant’s challenge for cause, and the record supports its decision. There was no error in so ruling.
Ingeburg C. had read a newspaper article reporting Ronaldo Ayala’s sentence and mentioning that jury selection in defendant’s case was pending. She testified that she only vaguely recalled its content and that “it doesn’t affect me”; “I have an open mind, and you have to prove . . . that he’s guilty.”
The trial court denied defendant’s challenge for cause. Reviewing the record, we see no evidence that Ingeburg C.’s knowledge of Ronaldo Ayala’s sentence affected her impartiality. The record is, rather, entirely to the contrary. The ruling was proper.
The other prospective juror to whom defendant refers, Bette C., was not, in fact, the object of a challenge for cause.
In sum, the court committed no error under state law in respect of any of the contentions defendant presents regarding the aspects of jury selection discussed in this section. Because defendant’s constitutional claims are predicated on a violation of state law, they must be rejected.
In addition, defendant claims that the trial court improperly denied a motion to give him additional peremptory challenges. As a result, he claims, three jurors, unable to be impartial because they knew about Ronaldo Ayala’s conviction or sentence, or both, were seated.
He refers to Jurors Lois B., Charles C., and Charles G. But as we have explained, there was no evidence of bias among them. Because the factual predicate of his claim is inaccurate, it cannot be sustained on review.
E. Claim of Error in Excusing a Prospective Juror Because of Her Views on Capital Punishment
Defendant claims that the Sixth and Fourteenth Amendments to the United States Constitution were violated when the trial court granted the prosecution’s motion to excuse a prospective juror for substantially impaired ability to follow the law regarding capital punishment. (Wainwright v. Witt (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].)
*275 “As we [have] explained . . . , ‘[w]hen a prospective juror’s views about the death penalty “would ‘prevent or substantially impair the performance of his [or her] duties as a juror’ ” [citation], the juror is not impartial and may be challenged “for cause.” ’ ” (People v. Earp (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15].) This test applies equally to defense and prosecution challenges. (Ibid.) As stated, “ ‘if the juror’s statements are equivocal or conflicting, the trial court’s determination of the juror’s state of mind is binding. If there is no inconsistency, we will uphold the court’s ruling if it is supported by substantial evidence. [Citations.]’ [Citation.] A juror’s bias need not ‘be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.’ ” (People v. Carpenter, supra, 21 Cal.4th 1016, 1035.)
Linda J.’s answers were inconsistent. Initially she testified that she would “find it difficult” to return a verdict of death. She stated that she went beyond being unsure about imposing the death penalty; rather, “I don’t think I’m capable of that.” But she also testified that she favored the death penalty in the abstract, and she hypothesized that the trial might enable her to summon the will to impose it.
After initially denying the prosecution’s challenge for cause on the ground that Linda J. was “impaired, but not substantially,” the trial court later reversed itself, finding that her ability to serve as a juror was substantially impaired.
Because Linda J.’s answers were inconsistent, but included testimony that she did not think herself capable of imposing the death penalty, we are bound by the trial court’s determination that her candid self-assessment showed a substantially impaired ability to carry out her duty as a juror. There was no violation of any constitutional right.
F. Denying Two Challenges for Cause by Defendant
Defendant claims that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 15, 16, and 17 of the California Constitution were violated when the trial court denied his motions to excuse two prospective jurors for substantially impaired ability to follow the law regarding capital punishment.
In response to initial questions by the court, Herman J. testified, without qualification or equivocation, that he would not automatically vote for the *276 death penalty if the case reached that stage. Then defense counsel questioned him about his statement on his questionnaire that the death penalty should always be imposed for calculated, methodical murder. In response to leading questions, Herman J. testified, contrary to his response to the court’s question, that he would always impose the death penalty for an intentional killing accompanied by a special circumstance, and in essence that he would not pay attention to the defense case in mitigation at the penalty phase.
Asked by the prosecutor whether he could consider mitigating evidence at a penalty phase, Herman J. testified, “I would want to consider the evidence and the additional information. Even though I felt, maybe, that he should get the death penalty, I would still be willing to consider any other . . . additional evidence.”
The prosecutor asked: “Are you of the frame of mind that any witness called—if any witness were called by the defense on the subject of mitigating evidence, that that witness would be absolutely wasting his time . . . ?” Herman J. responded, “Well, I don’t think it should be absolutely concrete, [f] I would be willing to hear additional statements, or anything that . . . might alter the situation. [1[] . . . ffl] Even though I believe in the death penalty and all that, I’m not so set in my ways that I wouldn’t listen to . . . anything that might alter the decision . . . .’’He added that he would not always impose the death penalty “regardless of the situation or regardless of additional information.” He also testified that he could follow an instruction to return a verdict for death only if the aggravating evidence substantially outweighed the mitigating.
Defense counsel then asked Herman J. to explain his inconsistent statements. The prospective juror testified that when “I realized I answered your question by saying ... if found guilty without a shadow of a doubt I would want the death penalty, but I wasn’t. . . considering the fact that you have additional evidence that alters, possibly alters it. [1Q . . . [H] . . .I’m just saying I would . . . always be willing to listen to additional evidence . . . and possibly change to a life sentence.” In sum, Herman J. testified that he might be presented with evidence “important enough to consider the life sentence rather than the death penalty, even though I lean towards the death penalty.” But that mitigating evidence would have to be “strong” and “meaningful” to alter his predisposition to impose the death penalty.
Defendant argued, without success, to the trial court that Herman J.’s final answer confirmed what many of his others had suggested: that he would impose the death penalty unless presented with mitigating evidence that substantially outweighed that in aggravation, and hence could not follow his oath. He renews that argument here.
*277 The trial court made no comment on its ruling beyond a statement that Herman J. was not substantially impaired. On this record, we cannot say that substantial evidence did not support the ruling. We believe that Herman J.’s testimony pointed to two views that did not conflict. He testified that his own predilection, unmoored by legal instruction, would be to impose death unless there was a substantial reason not to. But he also testified, not inconsistently, that he could and would follow an instruction that directed him not to follow his own predilection but instead the law. Substantial evidence supports the court’s ruling.
Patricia P.’s daughter was a San Diego County Sheriff’s deputy, and her son was a police officer with the Chula Vista Police Department. He had previously been a San Diego police officer. Patricia P. testified that she thought the justice system was too lenient and that a criminal defendant should bear the burden of proving innocence. In her questionnaire, she stated that she favored increased use of the death penalty, and automatic imposition of a capital sentence for multiple murder—one of the special circumstances charged here. But on voir dire examination by defense counsel, she stated that she “would like to think that there would be other options” than the death penalty even in a multiple-murder case. And she also testified that she could follow the law on the presumption of innocence and the requirement of proof beyond a reasonable doubt even if such tenets contradicted her beliefs, that she could consider evidence in mitigation even if defendant were convicted of multiple murders, and that she would follow an instruction that she could not vote for the death penalty unless the aggravating evidence substantially outweighed that in mitigation.
Defendant challenged Patricia P. for cause on the ground that her views of the law substantially impaired her ability to follow her oath as a juror. The court disagreed, stating that “clearly this [prospective] juror is not impaired.” Substantial evidence supports that determination. As with Herman J., there was substantial evidence that she could separate her personal beliefs from her duties as a juror.
In conclusion, we discern no violation of any constitutional provision.
G. Representation ofHispanics and the Young in Jury Pool
Defendant, who is Hispanic, contends that underrepresentation of Hispanics in the jury pool violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution. He also claims that underrepresentation of the young violated his rights to a representative jury pool. He brought the same claims at trial, but the trial court rejected them.
*278 These are the same claims that were presented in People v. Ayala, supra, 23 Cal.4th 225, 256-257.) We rejected them there, and again do so here.
With regard to young people, the trial court ruled that the young are not a cognizable group, but even if they were, there was no improper exclusion of them in the jury selection process.
“California courts have not been receptive to the argument that age alone identifies a distinctive or cognizable group within the meaning of [the representative cross-section] rule.” (People v. McCoy (1995) 40 Cal.App.4th 778, 783 [47 Cal.Rptr.2d 599] [citing cases].) We need not decide, however, whether peremptory challenges on the basis of age violate the strictures of Batson or Wheeler, defendant simply does not persuade, any more than he does regarding Hispanic jurors, that the young were improperly excluded under the jury selection system in place. As the People observe, aside from a mention of statistical disparity in the presence of young people as a result of the jury selection process, a factor that does not by itself establish systematic exclusion (People v. Ayala, supra, 23 Cal.4th 225, 257), the only fault defendant finds with the process is that the master list of the jury pool was only updated annually, so that those who turned 18 during the year would not be included and some 18 year olds would turn 19. We do not believe that amounts to systematic exclusion. In order to avoid that effect or a similar one, the master list would have to be updated daily. The law does not require such diligence.
II. Guilt Phase Issues
A. Search of the Garage Office and Seizure of Items Therefrom
At trial, defendant filed a motion to exclude evidence obtained from a search of the automobile body shop garage where the murders occurred. (§ 1538.5.) He claimed that (1) searching the premises, and (2) removing therefrom certain small items, namely “vodka containers, orange juice containers and beer cans in which [he had] a proprietary interest,” violated his rights under the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution.
The evidence regarding the relevant fingerprint evidence is as follows: The police recovered two orange juice containers and a vodka bottle from the office where the victims’ bodies lay. One orange juice container was full; the other contained a small amount of liquid. A fingerprint examiner identified defendant’s fingerprint on one of the orange juice containers. An evidence technician had obtained the print, but he failed to note whether it came from the full or the almost empty container.
*279 We apply the Fourth Amendment standard in deciding what remedy may be available following a claim of unlawful search or seizure. (In re Lance W. (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744]; Bowens v. Superior Court (1991) 1 Cal.4th 36, 47 [2 Cal.Rptr.2d 376, 820 P.2d 600].)
“ ‘An appellate court’s review of a trial court’s ruling on a motion to suppress is governed by well-settled principles. [Citations.] HD In ruling on such a motion, the trial court (1) finds the historical facts, (2) selects the applicable rule of law, and (3) applies the latter to the former to determine whether the rule of law as applied to the established facts is or is not violated. [Citations.] “The [trial] court’s resolution of each of these inquiries is, of course, subject to appellate review.” [Citations.] [^] The court’s resolution of the first inquiry, which involves questions of fact, is reviewed under the deferential substantial-evidence standard. [Citations.] Its decision on the second, which is a pure question of law, is scrutinized under the standard of independent review. [Citations.] Finally, its ruling on the third, which is a mixed fact-law question that is however predominantly one of law, ... is also subject to independent review.’ ” (People v. Alvarez, supra, 14 Cal.4th 155, 182.)
The claim is without merit. Even if defendant left the containers at the automobile body shop while there as an invitee or a social guest, he had no expectation of privacy in the premises. “ ‘ “[Occasional presence on the premises as a mere guest or invitee” ’ ” is insufficient to confer such an expectation. (U.S. v. Chaves (11th Cir. 1999) 169 F.3d 687, 691.) Moreover, the trial court found that he had abandoned the containers—a factual finding supported by substantial evidence and to which, accordingly, we defer. Abandoning them, he relinquished any expectation of privacy in them. As a general matter, “ ‘the overwhelming weight of authority rejects the proposition that a reasonable expectation of privacy exists with respect to trash discarded outside the home and the curtilage thereof.’ ” (People v. Machupa (1994) 7 Cal.4th 614, 629, fn. 5 [29 Cal.Rptr.2d 775, 872 P.2d 114]; see People v. Roybal (1998) 19 Cal.4th 481, 507-508 [79 Cal.Rptr.2d 487, 966 P.2d 521]; see also Abel v. United States (1960) 362 U.S. 217, 240-241 [80 S.Ct. 683, 697-698, 4 L.Ed.2d 668].)
For the foregoing reasons, we find defendant’s Fourth Amendment claims to lack merit, and reject them.
B. Radiologist’s Testimony on Bullet Size
Defendant claims that the court erred under state law in permitting testimony outside of the expertise of a witness.
*280 Before the radiologist testified, Pedro Castillo testified that two guns were used in the robbery. Defendant had one, Ronaldo Ayala the other. Castillo did not testify that the two exchanged weapons at any point; rather, both kept control of their respective guns. He further testified that a shot was fired at him as he tried to flee and he felt the impact of a bullet. According to other testimony, .22-caliber bullet casings were found on the curb near South Forty-third Street, and a .38-caliber bullet was found in the body shop office, near Dominguez’s foot. The murder victims had all been shot exclusively by a .38-caliber gun, except Dominguez, who received one .22-caliber and one .38-caliber wound. Hence, the best interpretation of the evidence at that point was that defendant shot Rositas and Zamora twice and Dominguez once with his .38-caliber gun, all execution-style, whereas Ronaldo Ayala shot Dominguez once and Castillo with his .22-caliber gun.
That interpretation was buttressed by the testimony of Leland Everett Kellerhouse, Jr., M.D. The shot that hit Castillo remained in his body, so it was decided to tape bullets of known caliber to Castillo’s skin and take X-ray photographs capturing those bullets and the one in his body to determine the caliber of the latter projectile. Dr. Kellerhouse, a diagnostic radiologist certified as an expert in that area, was preparing to testify about the content of the X-rays, but defense counsel objected, saying “if he’s going to give an opinion as to the caliber of the bullet, I’ll object. . . .” The court asked, “Based upon the comparison of the projectiles? ffl] The objection is noted, overruled.”
Dr. Kellerhouse then proceeded to explain that the bullet inside Castillo was lodged about 1.5 inches below the skin. An investigator taped two bullets to Castillo’s skin above the location of the lodged bullet. The prosecutor asked Dr. Kellerhouse if he knew the caliber of the taped bullets, but he declined to give a definitive answer, saying, “I’m not an expert in ballistics.” He did testify, however, that the X-ray would hardly distort, if it did so at all, the relative sizes of the bullets, so that a comparison of size based on the X-ray would be valid.
On redirect examination, the prosecutor asked Dr. Kellerhouse, “applying . . ..your expertise [in] the interpretation of X-rays, and considering the technique that was utilized in this case, do you have an opinion as to whether the projectile within Mr. Castillo . . . was of the same size as either of the two that were taped to Mr. Castillo’s stomach?” Dr. Kellerhouse responded that “the deformed projectile within the patient most likely represents . . . the same caliber as . . . the [taped] projectile . . . just to the left... of the projectile within the patient.” The investigator then testified that the smaller projectile he taped to the body was a .22-caliber bullet. Apparently that was *281 the bullet that the X-ray showed to be taped immediately to the left of the lodged bullet.
Defendant contends that the foregoing amounted to expert testimony in ballistics, a topic in which Dr. Kellerhouse was not an expert.
The contention is without merit. Dr. Kellerhouse acknowledged that he was not a ballistics expert, and declined to testify about the bullets’ caliber. He did testify that both bullets appeared to be the same “caliber,” by which he could have meant the same size—defendant did not object or ask the radiologist to clarify his meaning in further examination. As a radiologist, Dr. Kellerhouse could testify that the bullets were located so that their relative size would not be distorted in the X-ray photographs.
Defendant next claims that the court failed to follow the rule of People v. Kelly (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240], regarding the admission of scientific evidence via expert testimony, when it permitted Dr. Kellerhouse to testify about the results of the purported bullet-comparison experiment.
Kelly “set forth certain ‘general principles of admissibility’ of expert testimony based on new scientific techniques, including the following ‘traditional’ two-step process: ‘(1) [T]he reliability of the method must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly qualified as an expert to give an opinion on the subject. [Citations.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case.’ ” (People v. Leahy (1994) 8 Cal.4th 587, 594 [34 Cal.Rptr.2d 663, 882 P.2d 321], italics omitted, quoting People v. Kelly, supra, 17 Cal.3d 24, 30.)
But Kelly does not apply here. This was not an experiment at all. As we recently stated, “The Kelly test is intended to forestall the jury’s uncritical acceptance of scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate.” (People v. Venegas (1998) 18 Cal.4th 47, 80 [74 Cal.Rptr.2d 262, 954 P.2d 525].) But here, where “a procedure isolate[d] physical evidence whose existence, appearance, nature, and meaning are obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under the standards of Kelly.” (People v. Webb (1993) 6 Cal.4th 494, 524 [24 Cal.Rptr.2d 779, 862 P.2d 779] [holding that Kelly does not apply to a chemical, laser, and photographic process used to expose and identify defendant’s fingerprint on duct tape found at the crime scene].) There was no Kelly error in presenting the evidence.
*282 Next, defendant asserts in essence that Dr. Kellerhouse conducted a scientific experiment that did not satisfy foundational relevance requirements. One requirement is that “the experiment must have been conducted under substantially similar conditions as those of the actual occurrence . . . .” (People v. Bonin (1989) 47 Cal.3d 808, 847 [254 Cal.Rptr. 298, 765 P.2d 460].)
Setting aside any question whether defendant has waived this claim, we find it to lack merit. The X-ray procedure was not an experiment performed in order to duplicate the conditions of the crime—as stated, it was not an experiment of any kind. Rather, it was simply a procedure that gave the radiologist an opportunity to describe a physical effect of the shooting that the jury could not discern without expert help.
C. Excluding Admission of Evidence of Arming During Prior Crime
The trial court ruled that defendant could not impeach Castillo with an inquiry whether, some 14 years before his testimony, he had been convicted of a felony: possessing narcotics for sale while armed with a .22-caliber pistol. The court allowed defendant to inquire about Castillo’s conviction for drug possession for sale, but not about any element of the offense that he was armed. It ruled that evidence of being armed would be substantially more prejudicial than probative under Evidence Code section 352.
Defendant claims that the court erred in excluding the evidence under Evidence Code section 352. In particular, he asserts, knowing about Castillo’s prior gun possession might have led the jury to wonder about Castillo’s criminal sophistication and whether Castillo’s story that defendant and Ronaldo Ayala killed Rositas, Zamora, and Dominguez, was true. He argues that depriving him of the opportunity to raise that question was error. We disagree.
In ruling on the question whether evidence is substantially more prejudicial than probative, the trial court enjoyed broad discretion. (Evid. Code, § 352.) “[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.” (People v. Wheeler (1992) 4 Cal.4th 284, 296 [14 Cal.Rptr.2d 418, 841 P.2d 938].) And the truth-in-evidence provision of the California Constitution (art. I, § 28, subd. (d)), contrary to defendant’s claim, did not limit the court’s power to exclude the evidence under section 352. The provision itself so provides.
*283 One might conclude, of course, that it would not unduly consume time or confuse the jury to allow defendant to inquire into the arming aspect of Castillo’s conviction. But we are required to defer to the trial court’s ruling. Given that the conviction was 14 years old and the fact that Castillo was armed would not have revealed any further character trait that would have been particularly telling for impeachment purposes, we are unable to say that the trial court abused its discretion in ruling as it did.[5]
D. Denying Motion for Mistrial
Defendant claims that the trial court committed reversible error under state law when it denied his motion for a mistrial following a witness’s reference to Ronaldo Ayala’s case.
Juan Manuel Meza testified for the prosecution. He had previously testified at Ronaldo Ayala’s trial. (People v. Ayala, supra, 23 Cal.4th 225, 243-244.) The parties agreed, in a discussion with the court and Meza before Meza’s testimony, that Meza would refer to Ronaldo Ayala’s trial by a euphemism such as “the ‘previous proceedings’ or the ‘1988 proceedings’ and that the word ‘trial’ is not to be utilized.”
As Meza was beginning to testify about defendant and Ronaldo Ayala’s plan to rob and murder people at the automobile body shop, this exchange occurred between the prosecutor and Meza:
“Q. Did I tell you that we would ask the judge to reconsider your sentencing?
“A. Yes.
“Q. And when was that to have occurred?
“A. When I testified on the case of Ronaldo Ayala.”
Defendant objected, but the court overruled the objection, stating, “As to the sequence and [insofar as] it was to be at a hearing, the answer will remain.” At the next recess, defendant moved for a mistrial on the basis that Meza “was not to allude to the trial of Ronaldo Ayala,” but the court denied the motion.
We review a ruling denying a motion for mistrial for abuse of discretion. (People v. Welch (1999) 20 Cal.4th 701, 749 [85 Cal.Rptr.2d 203, 976 P.2d *284 754].) We find none. “[A] motion for mistrial should be granted only when ‘"‘a party’s chances of receiving a fair trial have been irreparably damaged.” ’ ” (People v. Ayala, supra, 23 Cal.4th 225, 282.) Defendant has not shown that any irreparable damage—indeed, any damage at all—occurred here. Meza’s comment was, as the People argue, innocuous. The jury had already been exposed to evidence that Ronaldo Ayala robbed and killed along with defendant. Indeed, Meza himself testified, without objection, that Ronaldo Ayala said, at a meeting to plan the robbery, that every victim of the robbery was to be bound with duct tape and killed. Finally, the jury was instructed, before beginning to deliberate, that it was not to discuss or consider the legal fate of any perpetrator other than defendant. There was no error.
And for the foregoing reasons, we also reject defendant’s argument that the trial court committed reversible error in failing to grant his motion for mistrial because the prosecutor, in his rebuttal argument, referred twice to witnesses’ attendance at more than one trial.
The Penalty Phase

Facts

I. Prosecution’s Case
In addition to defendant’s prior felony convictions, the prosecution presented evidence of his prior violent criminal activity. In chronological order, the evidence related to the following episodes:
A. Holdup and Hostage-taking at Fast-food Restaurant in 1975
This episode underlay defendant’s 1975 felony conviction for burglary. Witnesses testified that on March 28,1975, he held up the Picnic ’N Chicken fast-food restaurant on Euclid Avenue at Eighth Street in National City. He held a gun to an employee’s head while the manager complied with his demand for money. After collecting the money, he announced that he and his hostage, a woman, were departing, but the manager said the cash weighed too much for the hostage to carry and offered to substitute himself, which defendant allowed. The manager and defendant walked outside, where a police officer shot defendant, allowing the manager to escape unhurt.
B. Stabbing Another Prison Inmate in 1976
Robert Richard Maytorena testified that he shared space in a dormitory at Tehachapi State Prison with defendant. Defendant asked to borrow his radio *285 and Maytorena refused. The two had other disputes. On August 25, 1976, Maytorena awoke to find defendant stabbing him with a screwdriver. He jumped up. Defendant looked startled, as if surprised he had not killed him, and ran away.
Maytorena was taken to the hospital. He testified that he lost his spleen and a kidney and that he was told it was miraculous he had survived. At the time of trial he still suffered flashbacks of the incident, and he had continuing medical problems from the stabbing.
C. Killing Another Prison Inmate in 1982
Witnesses testified that defendant stabbed Jesse (or Jessie) Manuel Apodaca to death on September 6, 1982, in an exercise yard at Folsom State Prison. Daniel Apodaca, Jesse Apodaca’s brother, testified that he saw defendant stabbing him multiple times, and he did not see anyone else stabbing him. A pathologist testified that Jesse Apodaca suffered five stab wounds, and died of a stab wound to the heart.
II. Defense Case
Defendant did not testify at the penalty phase, but various relatives testified about his background, along the lines of the testimony given in People v. Ayala, supra, 23 Cal.4th 225, 296-297. In addition, Marjorie Suarez, defendant’s half sister, testified that their mother, Rosa Ayala, was and remained an alcoholic, and that she was not affectionate or demonstrative. She explained that many of Rosa Ayala’s children had encountered misfortune: some were in prison and one had died of a heroin overdose. She begged the jury to spare defendant’s life.
Rosa Ayala testified that defendant has four children and is married. She testified that he was respectful of his parents as a child.
Jose R. Ayala, defendant’s father, testified with the aid of an interpreter.[6] When defendant was about 12 to 14 years old, his half brother Ernie almost died of a heroin overdose. Jose Ayala had to break down the bathroom door to rescue him. He told the jury that he wanted defendant to be punished, not by death, but “in jail, so that his children would see him.”
Barbara Moreno, defendant’s sister, testified that as an adult, defendant, who lived across the street, would help take care of her children when *286 needed. She further testified that defendant was a warm parent and husband, despite a difficult home life; their father was once jailed for domestic violence.
Defendant’s half sister, Esther Brosnan, testified that Rosa Ayala “[njever grew up” and should not have had eight children.
Defendant introduced evidence to suggest that Ronaldo Ayala was the ringleader of the crimes at the body shop. Various witnesses testified that Ronaldo Ayala was the leader of the two brothers and that defendant was under his influence.
The defense also presented evidence to cast doubt on defendant’s role in the prison assaults, particularly the killing of Jesse Apodaca. It called two witnesses, Guadelupe Navarro and Jorge Ramirez Acosta, also then, incarcerated at Folsom, who controverted other accounts of the stabbing. Both testified that immediately afterward prison guards lined up several inmates against the wall, but defendant was not among them—he was nearby, but not in the immediate vicinity of the mortally wounded inmate. By contrast, other witnesses, including the guard involved, had testified that a guard grabbed defendant while he was still stabbing and kicking Apodaca, or immediately afterward, and placed him under arrest against the wall.
The prosecution impeached Navarro with evidence that he had told investigators he did not want to gain a reputation as a “rat” by testifying against another inmate. And Daniel Apodaca, called as a rebuttal witness, testified that neither Navarro nor Acosta was in the exercise yard when his brother was killed.
There had been testimony that the inmate who stabbed Apodaca did so using his right arm, and the defense used it to its advantage. James Grisolia, M.D., a clinical neurologist, testified regarding the weakness of defendant’s right arm and shoulder that stemmed from being shot during the 1975 Picnic ’N Chicken robbery. Dr. Grisolia explained that defendant had fairly good mobility in his right arm, but that the arm and his right hand were weak, as were the muscles that elevate the arm and wrist. His condition would have been worse in the past, and Dr. Grisolia doubted that he would have been able to penetrate a victim’s rib with a knife held in his right hand and inflicted a wound in the heart. But he noted that defendant was left-handed, and acknowledged that his left hand would be able to inflict a knife wound to the heart.
*287 The defense also presented evidence to the jury that defendant had never been charged with Apodaca’s killing, or in any other prison assault. A former parole officer testified that the authorities’ policy is to prosecute in-prison crimes if there is sufficient evidence to do so. And there was testimony that defendant and Apodaca had reconciled, following an exchange of insulting remarks, when Apodaca apologized.
Issues on Appeal
Defendant presents a number of legal arguments related to the penalty phase proceedings. As will appear, none has merit.
A. Prosecutor’s Appointment to Municipal Court Bench
Following the close of the guilt phase, the parties discussed whether to tell the jury that the lead prosecutor, Woodward, had just been appointed to the San Diego Municipal Court and would no longer appear for the People. The trial court was inclined to inform the jury of the fact. Defendant urged that the court instead limit itself to saying Woodward had departed for positive professional reasons. To do otherwise, he argued, would be to burnish the prosecution’s stature before the jury and improperly enhance the possibility of a verdict of death.
The trial court, stating that Woodward’s appointment was public knowledge, disagreed. It said that it did not wish to lose credibility with the jurors, in essence by giving them a vague and unsatisfying explanation for Woodward’s absence, and informed them that Woodward had departed for an appointment to the bench, a process that had been underway before the prosecution of defendant.
Defendant renews his argument here. He claims that informing the jury of Woodward’s elevation to the bench enhanced the prosecution’s stature, depriving him of a trial before an impartial judge because the trial court now appeared to be the prosecutor’s colleague, and violating his constitutional right to due process of law generally.
We reject defendant’s claim. It is purely speculative. Nothing in the record shows that the jury was influenced in any way by Woodward’s appointment. The same applies to defendant’s argument that the trial court now appeared to the jury to be on the side of the prosecution. We also note that the prosecutor’s departure was, so to speak, a clean break. Although the jury knew that the People were seeking the death penalty, the jurors had not yet heard the prosecution’s case that defendant should be executed. The jury had *288 already returned its verdict of guilt, and that verdict could not have been influenced by Woodward’s appointment.
B. Prosecutor’s Remark About Taking Case Seriously
At closing argument, the prosecutor urged that defendant be sentenced to death, meriting nothing less, and said that she did not ask for the death penalty “lightly.” Defendant asked the court to assign misconduct to the remark because it amounted to a personal endorsement of the need for the verdict, but the court ruled that the prosecutor’s comment was proper and denied the motion.
On appeal, defendant claims that the ruling violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and article I, section 17 of the California Constitution. He also contends that it contravened state law beyond the constitutional guaranty, and indeed his constitutional claims are predicated on state law error.
“When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of.” (People v. Osband (1996) 13 Cal.4th 622, 689 [55 Cal.Rptr.2d 26, 919 P.2d 640].)
“[A] prosecutor may not. . . vouch personally for the appropriateness of the verdict he or she urges.” (People v. Benson (1990) 52 Cal.3d 754, 795 [276 Cal.Rptr. 827, 802 P.2d 330].) But there is no reasonable likelihood that the jury would have understood the prosecutor’s remark as doing so. She was stating “what was obvious and altogether unobjectionable—i.e., that it was the People’s position that defendant’s crimes called for the ultimate sanction.” (Ibid.) By declaring that she did not take that position lightly, she was saying that it was the People’s considered position, and not whimsical. (People v. Scott (1997) 15 Cal.4th 1188, 1219 [65 Cal.Rptr.2d 240, 939 P.2d 354].) But that was stating the obvious. We discern no misconduct. Because there was no violation of defendant’s state law rights, and his constitutional claims are predicated on his state law claim, we reject them as well.
C. Failing to Instruct Not to Double-count Aggravating Factors
It will be recalled that the jury convicted defendant of three murders and found true a special circumstance of multiple murder. It also convicted him of two attempted robberies and found true a special circumstance of felony-murder attempted robbery. Defendant claims that the court *289 violated the Eighth and Fourteenth Amendments to the United States Constitution in refusing to give this instruction, which he requested, to the jury before it decided the penalty: “You must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crime for which the defendant has been convicted. [^] In other words, do not consider the same factors more than once in determining the presence of aggravating factors.”
Instead, the court instructed the jury thus: “In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case . . . .You shall consider, take into account and be guided by the following factors, if you find them to be applicable in this case: [ftj (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.” This was, in substance, the standard language of part of CALJIC No. 8.85 (5th ed. 1988).
In People v. Melton (1988) 44 Cal.3d 713 [244 Cal.Rptr. 867, 750 P.2d 741], we stated, “The literal language of [factor] (a) presents a theoretical problem . . . since it tells the penalty jury to consider the ‘circumstances’ of the capital crime and any attendant statutory ‘special circumstances.’ Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any ‘circumstances’ which were also ‘special circumstances.’ On defendant’s request, the trial court should admonish the jury not to do so. ft[] However, the possibility of actual prejudice seems remote . . . .” (Id. at p. 768, second italics added.)
“When reviewing a supposedly ambiguous [i.e., potentially misleading] jury instruction, ‘ “we inquire ‘whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way’ that violates the Constitution.” ’ ” (People v. Welch, supra, 20 Cal.4th 701, 766.)
We discern no such reasonable likelihood here. “[W]e have already concluded that the standard instructions do not inherently encourage the double counting of aggravating factors. [Citations.] We have also recognized repeatedly that the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor.” (People v. Barnett (1998) 17 Cal.4th 1044, 1180 [74 Cal.Rptr.2d 121, 954 P.2d 384].) There was no misleading argument here.
The prosecutor’s closing argument separated the murders and other crimes at the body shop as circumstances of the crime under section 190.3, factor *290 (a) from the evidence of defendant’s other prior misconduct, informing the jurors that they were not to consider the circumstances of the crimes both under section 190.3, factor (a), and as prior violent criminal activity (id., factor (b)) or as prior felony convictions (id., factor (c)). Pointing to information presented in chart form, she said, “The boards that are in yellow represent [defendant’s] felony convictions. The boards that are in red represent his violent acts, and the board that is in purple represents the underlying crimes in the body shop.” In sum, she said nothing that might mislead the jury as defendant suggests. (See People v. Barnett, supra, 17 Cal.4th 1044, 1179.) As stated, this record gives no indication of a reasonable likelihood that the jury applied the instructions given it in a legally improper manner.
D. Other Claims
Defendant claims that the 1978 death penalty scheme is unconstitutional in various respects—for example, in permitting the prosecution to introduce evidence of his prior violent criminal activity at the penalty phase. But as a “ [1] “general matter at least, the 1978 death penalty law is facially valid under the federal and state charters. . . . We see no need to rehearse or revisit our holdings or their underlying reasoning.” ’ ” (People v. Ochoa (1998) 19 Cal.4th 353, 478 [79 Cal.Rptr.2d 408, 966 P.2d 442].) We will, however, touch on defendant’s key arguments. Jury unanimity is not required to establish the truth of unadjudicated crimes. (People v. Carpenter, supra, 21 Cal.4th 1016, 1061.) Defendant was not entitled to a separate jury for the penalty phase. (People v. Pride, supra, 3 Cal.4th 195, 252.) The delay in presenting evidence of unadjudicated crimes did not amount to a stale prosecution (People v. Ayala, supra, 23 Cal.4th 225, 300) or violate any statute of limitations (People v. Carpenter, supra, 21 Cal.4th at p. 1061). The argument that each California county improperly applies its own standards to death penalty prosecutions is without merit. (People v. Holt (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also People v. Ochoa, supra, 19 Cal.4th at p. 479.) And the combination of numerous available special circumstances and the prosecution’s charging discretion does not render the death penalty law invalid. (See People v. Lucas (1995) 12 Cal.4th 415, 478 [48 Cal.Rptr.2d 525, 907 P.2d 373].)
Disposition
The judgment is affirmed.
Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Our own review of the record tends to confirm some of these observations. Galileo S. referred to the average juror as “Joe Six-Pack,” and he stated that “[m]ost people bother me.” He also exhibited a somewhat flippant attitude in responding to various questions during general voir dire.

Our own review of the record tends to confirm these observations. Gerardo O. acknowledged on voir dire that someone else had to complete his questionnaire for him. He appeared to have difficulty understanding the nature of the proceedings the jury might have to follow, and he admitted to defense counsel that he did not understand some of his questions. Following, and despite, defense counsel’s thorough examination, when the prosecutor asked Gerardo O. if he understood that the government was seeking the death penalty against defendant, he said, “I didn’t know that.” Gerardo O. also stated he was unsure whether he could impose the death penalty.

The dissent does not come to grips with the record’s strong factual base for our conclusion that the error was harmless. It evidently concludes that one need not, and should not, “credit this record.” (Dis. opn., post, at p. 298.)
We will not “credit this record” willy-nilly, but we are obliged to scrutinize it closely. We are mindful that whether or not of federal constitutional dimension, the error here is not structural; it is an error in the conduct of the trial that requires us to consider the record. In other words, the error does not fall within the category of those that the law recognizes as *267 reversible per se, i.e., “affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,” “ ‘transcending] the criminal process’ ” and “defying] analysis by ‘harmless-error’ standards.” (Arizona v. Fulminante (1991) 499 U.S. 279, 309-311 [111 S.Ct. 1246, 1264-1265, 113 L.Ed.2d 302].)

Defendant also claims that the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and their equivalents in article I, sections 15, 16, and 17 of the California Constitution, were violated. For the reasons explained in the text, we do not agree.

Defendant also claims that the court’s ruling violated the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 15 and 28, subdivision (d) of the California Constitution. For the reasons explained in the text, we do not agree.

In People v. Ayala, supra, 23 Cal.4th 225, 296, defendant’s father is identified as Rogelio “Joe” Ayala.

In response to the third motion, the court stated that it would “request further clarification from the People.” The prosecutor responded, “Would the court do that in private, or are we requiring it for counsel?” The court replied, “It will be a matter of record. It will happen in private.” Defense counsel asked, “Does the court wish us to leave the courtroom?” The court replied, “Yes.”