[Crim. No. 22774. Dec. 24, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
PRENTICE JUAN SNOW, Defendant and Appellant.

**COUNSEL**

Ellen Bailer Fondiler, under appointment by the Supreme Court, J. Courtney Shevelson, Joel Franklin and Prentice Juan Snow, in pro. per., for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Susanne C. Wylie, John R. Gorey and Ellen Birnbaum Kehr, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

LUCAS, C. J.—Defendant Prentice Juan Snow appeals from a judgment imposing the death penalty following his conviction of first degree murder (Pen. Code, § 187; all further statutory references are to this code unless otherwise indicated), accompanied by a special circumstance finding (§ 190.2, subd. (a)(10) [killing a witness to prevent his testimony]) and a firearm-use finding (§ 12022.5). As will appear, we conclude that the entire judgment must be reversed for *Wheeler* error (*People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]) that occurred during the jury selection process. In addition to discussing the *Wheeler* issue, we also, for guidance on retrial, reach one of defendant's other claims of error.

## I. THE FACTS

The information charged defendant with intentionally killing Alfred J. Koll to prevent his testimony in another criminal proceeding against defendant. The record indicates that on August 27, 1979, defendant and codefendant James Phillips robbed the Koll Professional Pharmacy in Pasadena. Following their arrest, Mr. Koll was the only witness at the preliminary examination to identify defendant as one of the robbers. Trial was set for November 3, 1980; Koll was subpoenaed as a prosecution witness.

On the morning of trial, defense counsel Lara discussed with the prosecutor the possibility of a plea bargain. Lara consulted with defendant, who indicated he wished to consider the matter during the lunch hour. Trial recessed at 11:30 a.m. Defendant was seen making a phone call and then leaving the building dressed in a suit and tie.

A witness thereafter saw a man enter the Koll pharmacy. He was wearing blue denim pants and matching jacket, gloves, and a blue or blue-green motorcycle helmet with a "bubble shield." Shortly thereafter several shots were heard emanating from within the pharmacy. Witnesses next saw the same man walking quickly away from the area, carrying the helmet and bubble shield and using them as a mask to cover his face while his other hand was concealed inside his jacket.

Police were called to the scene, where they found Koll's body. He had been shot seven times. Evidently nothing of value was taken from the pharmacy. A .38 caliber bullet fragment was found in one wound during Koll's autopsy.

Mr. Haney, the prosecutor in defendant's robbery case, was told of Koll's death during the noon recess. He returned to court at 1:25 p.m. Defendant

arrived with Attorney Lara around 1:45. Haney asked Lara if defendant would accept the plea bargain previously discussed, and Lara informed Haney that defendant had decided to "go to trial." Haney then told Lara and defendant about Koll's death. Although Lara appeared "dumbfounded," defendant showed no sign of surprise or other emotion.

Officers investigating the Koll shooting asked defendant to take a gun powder residue test of his hands. Defendant appeared agitated and asked several times to go to the washroom before the test was performed, which request was refused. Eventually, the test was performed with negative results. Expert testimony indicated, however, that residue will not be present if the shooter had worn a glove or had placed his hand in his pocket.

On the morning of the shooting, defendant had driven his girlfriend, Pat B., to work in his Buick. The investigating officers found the car parked in a lot near the courthouse, towed it to the police station and searched it pursuant to a warrant. They discovered a spiral notebook containing the telephone number of the Koll pharmacy, a portable police "scanner" used to monitor police radio calls, and a spent .38 caliber bullet casing.

The officers, while en route to the pharmacy, also found a discarded bubble shield and cloth liner from a motorcycle helmet. A fingerprint expert lifted latent prints from the bubble shield and spiral notebook; the prints matched defendant's. One officer testified that when he had previously arrested defendant on an unrelated theft, he was wearing blue Levi pants and jacket, and a blue motorcycle helmet with a bubble shield resembling the one found by the officers.

The distance from the courthouse to the parking lot where the Buick was parked was only a few hundred yards, requiring a three- to six-minute walk. The Koll pharmacy was less than a mile from the courthouse.

In his defense, defendant testified that he had spent the noon recess talking to his attorney, having lunch in the cafeteria, and checking on his car in the parking lot. He denied hearing Prosecutor Haney discuss Koll's murder (a denial confirmed by Attorney Lara), and he explained his fingerprints on the bubble shield by observing that as he entered the courtroom, one of the officers pushed the shield in his direction and asked if it was familiar. Defendant pushed the shield away, touching it with his fingers. (The officer denied any such occurrence.)

According to defendant, his own helmet and shield were stolen from him earlier that year. Defendant claimed he last saw the spiral notebook at his

house; he had not written the pharmacy number in the book, and likewise had no knowledge of the police scanner found in the car.

As part of the defense case, James Henry, defendant's cellmate in 1981, testified that defendant had admitted the following facts to him: (1) On the day of the shooting, defendant left the courthouse at the noon recess and walked to a supermarket to make a phone call; (2) a friend met him and brought him a police scanner; (3) defendant went to the Koll pharmacy wearing blue jeans, jacket and motorcycle helmet, and killed a man at that location; (4) he returned to the market where his car was parked and changed his clothes; and (5) thereafter he returned to the courthouse around 1 p.m. (The record is unclear why defendant chose to elicit Henry's damaging testimony.)

Defendant then resumed the stand and denied that he had conversed with any cellmate regarding his case. According to defendant, cellmate Henry had borrowed a copy of defendant's motion to dismiss (§ 995) in order to learn the factual details of defendant's case. Another inmate, Herman Blueford, confirmed that Henry was facing 60 to 70 years in prison and had asked him for help in borrowing documents regarding defendant's case.

Witness Henry ultimately was recalled by defendant and recanted his former testimony regarding defendant's admissions to him.

The jury found defendant guilty as charged. A penalty phase trial resulted in a death verdict, but the trial judge granted defendant's motion for a second penalty trial based on the fact that the trial court had given an improper commutation instruction. (See *People* v. *Ramos* (1982) 30 Cal.3d 553 [180 Cal.Rptr. 266, 639 P.2d 908], judgment vacated and cause remanded *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [77 L.Ed.2d 1171, 103 S.Ct. 3446], sub. opn. *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430].) The second penalty trial likewise resulted in a death verdict, and the trial court denied motions for new trial and modification of the judgment. The present appeal is automatic. (§ 1239.)

## II. GUILT PHASE CONTENTIONS

### A. *Misuse of Peremptory Challenges*

As previously indicated, defendant contends that the prosecutor misused his peremptory challenges to exclude several Black persons from the jury. After outlining the applicable law, we discuss in some detail the factual basis for defendant's contention.

■ In *People* v. *Wheeler, supra,* 22 Cal.3d 258, we ruled that peremptory challenges may not be used to exclude from a jury, solely because of a presumed "group bias," all or most members of an identifiable group of citizens distinguished on racial, religious, ethnic, or similar grounds. (See also *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People* v. *Turner* (1986) 42 Cal.3d 711, 715-716 [230 Cal.Rptr. 656, 726 P.2d 102], and cases cited.)

Under *Wheeler,* if a party believes his opponent is improperly using peremptory challenges for a discriminatory purpose, he must raise a timely challenge "and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (22 Cal.3d at p. 280, fn. omitted; accord, *Batson* v. *Kentucky, supra,* 476 U.S. at pp. 93-100 [90 L.Ed.2d at pp. 85-90, 106 S.Ct. at pp. 1721-1724].)

■ In subsequent cases, we have stressed the importance of an express ruling by the trial court as to whether a prima facie case has been shown, thereby requiring some response or explanation by the party exercising the peremptory challenges. (See *People* v. *Turner, supra,* 42 Cal.3d at pp. 719, fn. 3 [maj. opn. by Mosk, J.], 729 [conc. opn. by Panelli, J.].) Once a prima facie case has been shown, and an explanation tendered, the trial court must make a "sincere and reasoned attempt to evaluate the . . . explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the [counsel asserting the peremptory challenges] has examined members of the venire and has exercised challenges for cause or peremptorily, for 'we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' " (*People* v. *Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854], quoting *Wheeler, supra,* 22 Cal.3d at p. 282; see *People* v. *Turner, supra,* 42 Cal.3d at p. 728.)

Thus, in *Hall,* we reversed a judgment on *Wheeler* grounds where the trial court "apparently considered itself bound to accept all of the prosecutor's explanations at face value, expressing the view that group bias is shown only when a prosecutor declares an intent to exclude all members of an ethnic group from the jury. Such abdication is inconsistent with the court's obligations under *Wheeler.* . . ." (35 Cal.3d at p. 169.)

Defendant is a Black man accused of murdering a Caucasian victim. As will appear, in the present case the trial judge expressed repeated concern about the prosecutor's apparent use of peremptory challenges to exclude Black persons from the jury. Indeed, our review of the voir dire examination indicates that several Black venirepersons were excused after giving seemingly routine, acceptable responses to the prosecutor's questions. (The Attorney General concedes that, as to three of the six prospective jurors in question, the record reveals no "obvious" or "apparent" reason for excusing them.) Yet, despite defendant's repeated objections, the judge inexplicably failed to demand any explanations from the prosecutor for his apparent pattern of improper peremptory challenges.

The *Wheeler* issue was first raised by defendant after the prosecutor peremptorily challenged Mr. Daniels, one of the three challenged prospective jurors whose responses to questioning gave no apparent cause for challenge or concern. Defense counsel interrupted the proceedings to "make a record on what I believe to be a developing pattern. As far as my computations are concerned, three of the four peremptories that were exerted by the People were against what appear to be black people to me."

Although it was agreed that the prosecutor had excused two Black persons (Daniels and McDade), discussion ensued as to whether a third excused individual, Bradbury, was Black. The court, unable to recall Bradbury's race, ruled that "So far as the court is concerned, there have been two. There's no other way I can establish, of course, that there is a pattern." The court suggested that counsel henceforth make sure the record reflected whether challenged prospective jurors are "ethnically black," and the voir dire continued.

Thereafter, when prospective juror Cox was excused, the court noted for the record that she was Black. Despite defense counsel's request that the prosecutor be required to "express some kind of reason" for excusing the Black venirepersons, the court replied, "I don't believe at this point . . . that any pattern has been established." We observe that Miss Cox's responses, like those of Mr. Daniels, seemed quite acceptable from the standpoint of the prosecutor. The People have suggested no legitimate reason for excusing her.

When another Black venireperson, Mrs. Porche, was being examined, the prosecutor asked her various questions regarding her ability to convict a defendant based on circumstantial evidence. As with prior jurors, the prosecutor used an example involving a boy and a missing pie. The trial court thereupon convened a conference in chambers and warned the prosecutor that his hypothetical example and questions based thereon were confusing

and misleading. Significantly, the judge expressed his suspicion that the prosecutor was using the responses to these questions as a pretext for excluding some prospective jurors.

Thus, the trial judge observed "I'm getting concerned now *about the ethnic make up of the jury* and how those that are on are getting kicked. . . . I hope this line of questioning . . . is not aiding you in getting rid of those persons." (Italics added.) The prosecutor denied any "bias or selective excuse of jurors," and observed that while he had thus far passed a jury containing two Blacks, defense counsel had peremptorily excused thirteen White venirepersons. In the prosecutor's words, "I think it works both ways." The court responded, "It's obvious that the majority of jurors who are here are not black people. I'm not saying that those blacks that were excused that you're abusing your peremptory rights. I've ruled that way on the motion of the defense. . . . [¶] Now let's proceed."

Shortly thereafter, the prosecutor peremptorily excused Mrs. Porche. Defense counsel again argued that "a pattern" of excluding Blacks had emerged, and that "case law demands that some reason be stated" for her exclusion. The trial court replied, "Well, counsel need[s] no reason to excuse a juror." The court opined that the prosecutor probably had excused Mrs. Porche because of her responses to the circumstantial evidence questions, and observed that two Blacks remained on the jury.

Next, the prosecutor excused Miss West, a Black woman whose standard responses to the voir dire examination disclosed no particular reason for her exclusion. Defense counsel once again objected, stating that "It appears that it's a systematic exclusion of black jurors. . . . I ask the court to make that finding and I'm also requesting, pursuant to case law, that he provide the court with a reason why Miss West would not be eligible to serve . . . ." The court denied the motion "without prejudice," adding that "I'm going to read the case," presumably referring to our *Wheeler* case, *supra,* 22 Cal.3d 258. (Voir dire occurred in 1981, several years after *Wheeler* was filed.)

Immediately thereafter, and before adjourning to perform any such research, the court addressed the prosecutor, stating that it had become "obvious to me that you are—Apparently every time a black person gets in there—there are two left, that's true. And I don't know what the case holds, but I don't think that the test is necessarily that you have one or two on the jury. . . . That's why I'm reserving any ruling."

The prosecutor replied that "as I understand the case, it works both ways. The defendant has systematically excluded all white persons. There

has not been one minority excluded by the defense." The prosecutor continued to deny that any of his exclusions were based on race, stating "I have my reasons. If ordered by the court, I will produce those reasons."

Despite the court's indication that the matter was "reserved," the record fails to indicate any further ruling on defendant's motion until the prosecution peremptorily excused yet another Black, Mrs. Carr. Defense counsel renewed his previous objection and the court ruled simply, "The motion is denied," without giving any further explanation. The net result was that the prosecution peremptorily challenged six Black venirepersons. The jury as finally constituted contained two Black persons.

Initially, we observe that the prosecutor was in error in assuming that defense counsel's supposed wrongful exclusion of Caucasians in some manner justified his own exclusion of Black persons. As the People now concede, the propriety of the prosecutor's peremptory challenges must be determined without regard to the validity of defendant's own challenges. (See *People* v. *Wheeler, supra,* 22 Cal.3d 258, 283, fn. 30; *People* v. *Fuller* (1982) 136 Cal.App.3d 403, 418 [186 Cal.Rptr. 283].)

Nor does the fact that the prosecutor "passed" or accepted a jury containing two Black persons end our inquiry, for to so hold would provide an easy means of justifying a pattern of unlawful discrimination which stops only slightly short of total exclusion. (See *People* v. *Motton* (1985) 39 Cal.3d 596, 607-608 [217 Cal.Rptr. 416, 704 P.2d 176].) Although the passing of certain jurors may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection, it is not a *conclusive* factor.

As we stated in *Motton, supra,* 39 Cal.3d 596, quoting with approval an earlier Court of Appeal opinion, "The Attorney General argues that the prosecution's acceptance of the jury on three occasions, when there were one or two Blacks on the panel, rebuts defendant's prima facie showing. . . . 'If the presence on the jury of members of the cognizable group in question is evidence of intent not to discriminate, then any attorney can avoid the appearance of systematic exclusion by simply passing the jury while a member of the cognizable group that he wants to exclude is still on the panel. This ignores the fact that other members of the group may have been excluded for improper, racially motivated reasons.'" (*Id.* at pp. 607-608.)

In this regard, we disapprove language in *People* v. *Davis* (1987) 189 Cal.App.3d 1177, 1190-1191 [234 Cal.Rptr. 859], suggesting that the presence of two or three Blacks in the jury box following voir dire precludes the

trial court from finding a prima facie case of exclusion. *Davis* is apparently based on the premise that if the jury panel contains at least a minimum number of members of the cognizable group to provide defendant a representative cross-section of the community, he cannot complain of the prosecutor's pattern of unlawful discrimination in the use of his peremptory challenges. Nothing in our cases, or in *Batson* v. *Kentucky, supra,* 476 U.S. 79, supports such an analysis.

■ Our review of the record, summarized above, convinces us that, at least by the time prospective juror West was excused, defense counsel had adequately demonstrated a prima facie case of group bias sufficient to require the prosecutor to explain the reasons underlying his peremptory challenges. Indeed, the trial judge on two occasions seemed to recognize that such a showing had been made, but inexplicably declined to require the prosecutor to explain his reasons. Perhaps the trial judge's candid disclosure that "I don't know what the case [*Wheeler*] holds," remained true for the duration of the voir dire examination. In any event, it strongly appears that the trial judge, as in *People* v. *Hall, supra,* 35 Cal.3d 161, simply accepted at face value the prosecutor's denials of group bias, without making any "sincere and reasoned attempt" to evaluate the prosecutor's motives. Under *Hall,* "[s]uch abdication is inconsistent with the court's obligations under *Wheeler* . . . ." (35 Cal.3d at p. 169.)

The People's primary response on appeal is that because the prosecutor used 16 peremptory challenges but excluded "only" 6 Blacks, the present case is distinguishable from prior cases involving a larger percentage of exclusion on the ground of race. We find the distinction untenable, especially in a case in which even the trial judge expressed serious suspicions that the prosecutor was using some of his peremptory challenges to exclude Blacks. Under these circumstances, the trial court was obligated to conduct further inquiry on the record.

*Wheeler* error has been deemed reversible per se in light of the fundamental right involved. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 283.) The People suggest, however, that we merely order a "limited remand" to permit the prosecutor to explain his reasons for excluding the prospective jurors in question. We observe that, although our court has rejected such a procedure in prior cases (see *People* v. *Hall, supra,* 35 Cal.3d 161, 170-171 [trial held more than three years before reversal of judgment]; *People* v. *Allen* (1979) 23 Cal.3d 286, 295, fn. 4 [152 Cal.Rptr. 454, 590 P.2d 30] [trial held nearly three years before reversal of judgment]), the United States Supreme Court in the subsequently decided case of *Batson* v. *Kentucky, supra,* 476 U.S. at page 100 [90 L.Ed.2d at p. 90, 106 S.Ct. at p. 1725],

employed such a remand. (See also *United States* v. *Tindle* (4th Cir. 1986) 808 F.2d 319 [remand after more than three years].)

In *Batson,* the case had been tried only two years prior to reversal of the judgment. In the present case, voir dire examination commenced in November 1981, approximately six years ago. As in *Hall,* we believe it would be "unrealistic to believe that the prosecutor could now recall in greater detail his reasons for the exercise of the peremptory challenges in issue, or that the trial judge could assess those reasons, as required, which would demand that he recall the circumstances of the case, and the manner in which the prosecutor examined the venire and exercised his other challenges." (35 Cal.3d at p. 171.) Although it is unnecessary to discuss defendant's remaining contentions, we briefly explore one further issue to assist the trial court on retrial.

## B. *Nonassertive Conduct Evidence*

Prosecutor Haney was permitted to testify, over defendant's hearsay objection, that in defendant's presence he told Attorney Lara about Koll's death, and that defendant did not seem surprised, making no physical or verbal response and showing no emotional reaction to the news. According to Haney, in contrast Lara appeared "shocked and dumbfounded."

The trial court, impliedly finding that defendant indeed heard this conversation, admitted the foregoing evidence as amounting to an "adoptive admission" by defendant that he had shot Koll. Defendant properly observes that the evidence was not admissible on this basis, for there was no "admission" or accusation made for defendant to adopt or accept. (See *People* v. *Preston* (1973) 9 Cal.3d 308, 313-314 [107 Cal.Rptr. 300, 508 P.2d 300] [defendant's silence in face of accusation of crime admissible as implied or adoptive admission of guilt].)

But the evidence was properly admitted on another basis: Defendant's passive response to the prosecutor's statement was probative of defendant's prior knowledge of the Koll killing. Certainly, some sort of affirmative response could have been expected under these circumstances. Such nonassertive responses or reactions do not fall within the proscriptions of the hearsay rule. (See Evid. Code, §§ 1200 [hearsay rule applies to "statements"], 225 ["statement" does not include nonverbal conduct unintended as substitute for verbal expression]; see also *People* v. *Clark* (1970) 6 Cal.App.3d 658, 668 [86 Cal.Rptr. 106] [admissibility of wife's emotional

reaction to question asked of her husband during police interrogation].) Any objection based on the ambiguous nature of defendant's response would be addressed to the weight of the evidence, and not its admissibility.

The judgment is reversed.

Mosk, J., Broussard, J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

**EAGLESON, J.**—I concur fully in the majority's reversal of the judgment under *People* v. *Wheeler* (1978) 22 Cal.3d 258, 283 [148 Cal.Rptr. 890, 583 P.2d 748]. The prosecutor used six out of sixteen peremptory challenges to exclude Black venirepersons. The trial judge repeatedly expressed his suspicions and concern that the prosecutor was improperly utilizing his peremptory challenges to exclude Black persons. The judge further candidly disclosed that he was himself unfamiliar with the procedural requirements of *Wheeler*. Defense counsel having timely objected and adequately demonstrated a prima facie case of group bias sufficient to require the prosecutor to explain the reasons underlying his peremptory challenges, the court was obligated to conduct a further inquiry on the record in accordance with the procedures mandated in *Wheeler, supra,* 22 Cal.3d at page 280. (Accord, *Batson* v. *Kentucky* (1986) 476 U.S. 79, 93-100 [90 L.Ed.2d 69, 85-90, 106 S.Ct. 1712, 1721-1724].)

I write separately to note my concern over the majority's ambiguously worded observation that "the prosecutor was in error in assuming that defense counsel's *supposed* wrongful exclusion of Caucasians in some manner justified his own exclusion of Black persons." (*Ante,* p. 224, italics added.) In my view the majority's opinion might be mistakenly read as impliedly condoning such actions on the part of *defense counsel*.

The road paved by *Wheeler* is a two-way street. We explained therein that: "Although in the present appeal the Attorney General . . . does not claim the right to object to the same misuse of peremptory challenges on the part of defense counsel, we observe for the guidance of the bench and bar that he has that right under the constitutional theory we adopt herein: *the People no less than individual defendants are entitled to a trial by an impartial jury drawn from a representative cross-section of the community. . . .* [T]o hold to the contrary would frustrate other essential functions served by the requirement of cross-sectionalism." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282, fn. 29, italics added; see also *Commonwealth* v. *Soares* (1979) 377

Mass. 461 [387 N.E.2d 499, 517, fn. 35] [adopting the above-quoted reasoning of *Wheeler*].)

In *Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34 [132 Cal.Rptr. 680, 553 P.2d 1152] (affd. in part, revd. in part, *University of California Regents* v. *Bakke* (1978) 438 U.S. 265 [57 L.Ed.2d 750, 98 S.Ct. 2733]), we flatly rejected "the proposition that deprivation based upon race is subject to a less demanding standard of review under the Fourteenth Amendment if the race discriminated against is the majority rather than a minority." (*Bakke* v. *Regents of University of California, supra,* 18 Cal.3d 34, at p. 50.)[1] In my view this fundamental principle applies with equal force to *Wheeler-Batson* representative cross-section analysis under the Sixth Amendment (*Wheeler, supra,* 22 Cal.3d 258; *Batson, supra,* 476 U.S. 79) and our state constitutional counterpart. (Cal. Const., art. I, § 16.)

In response to the trial court's stated concerns during voir dire regarding the evolving " 'ethnic make up of the jury,' " the prosecutor denied any bias in his exercise of peremptory challenges, "and observed that while he had thus far passed a jury containing two Blacks, defense counsel had peremptorily excused thirteen White venirepersons. In the prosecutor's words, 'I think it works both ways.' " (*Ante,* p. 224.)

Assuming there was a legitimate basis to support the prosecutor's perception that defense counsel was himself exercising peremptory challenges against prospective Caucasian jurors solely on the basis of ethnic or group bias, the majority correctly observe that the prosecutor was in error in assuming defense counsel's improper conduct somehow justified his own exclusion of Black persons. (*Ante,* p. 225.) The propriety of the prosecutor's peremptory challenges must be determined independently of the validity of defense counsel's challenges; as we observed in *Wheeler,* "A party does not sustain his burden of justification by attempting to cast a different burden on his opponent." (*People* v. *Wheeler, supra,* 22 Cal.3d at 283, fn. 30.)

When either party believes his opponent is transgressing the fundamental constitutional right to an impartial jury guaranteed to a defendant and the People under article I, section 16, of the California Constitution (*Wheeler,*

---

[1] "The concepts of 'majority' and 'minority' necessarily reflect temporary arrangements and political judgments. . . . [T]he white 'majority' itself is composed of various minority groups, most of which can lay claim to a history of prior discrimination at the hands of the State and private individuals." (*University of California Regents* v. *Bakke, supra,* 438 U.S. 265, 295 [57 L.Ed.2d 750, 774] [opn. by Powell, J.].)

*supra,* 22 Cal.3d at 277, 282, fn. 29), the sole proper remedy is to alert the trial judge by timely objection, in order that the inquiries mandated by *Wheeler* might be initiated.

With this one reservation, I concur in the judgment.

Kaufman, J., concurred.

Respondent's petition for a rehearing was denied January 21, 1988.