[No. F048022. Fifth Dist. Sept. 21, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ANTHONY BUCHANAN, Defendant and Appellant.

## COUNSEL

Philip M. Brooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Julie A. Hokans, Jeanne Wolfe and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**VARTABEDIAN, Acting P. J.**—Defendant John Anthony Buchanan was convicted of one count of carjacking and the jury found true the special allegation that he personally used a knife during the commission of the offense. In addition, he admitted he had suffered two prior juvenile adjudications that amounted to strikes. He was sentenced to prison for a term of 27 years to life. He appeals, claiming the trial court erred in finding that he had not established a prima facie case of group bias during jury selection. This issue requires us to apply the United States Supreme Court case that changed the former standard in California to establish a prima facie case of group bias. (*Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410].) It should surprise no one that, as a reviewing court, we are only able to consider matters adequately raised in the record. Perhaps this cardinal principle of appellate review bears repeating in the present context. In addition, defendant asserts that his prior juvenile adjudications may not properly be utilized as strikes because he was not entitled to a jury trial during the juvenile proceedings. We affirm.

## Facts

The facts of the underlying offense are not pertinent to the issues on appeal. We briefly summarize them. Jaime Mendoza was driving his truck. He stopped at a stop sign. Defendant opened the passenger door to Mendoza's truck and got in. Defendant held a knife and ordered Mendoza to give him his wallet and get out of the truck. Mendoza jumped out of the truck and ran. Defendant drove the truck away.

## DISCUSSION

### I. Prima Facie Case

The People exercised three peremptory challenges of the potential jurors. All three of the challenges were to jurors with Hispanic surnames: Jurors Nos. 7, 11, and 12. Defendant contends the trial court erred in failing to find a prima facie case of group bias on the part of the prosecutor.

#### a. Test for a Prima Facie Case

■ The California Constitution and the United States Constitution prohibit the exercise of peremptory challenges solely because of group bias. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) When a defendant believes the prosecution is exercising peremptory challenges in violation of the Constitution, the trial court must follow this procedure: "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" (*Johnson v. California, supra,* 545 U.S. at p. 168 [125 S.Ct. at p. 2416], fn. omitted.)

In *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270], the California Supreme Court held that the test for establishing a prima facie case of group bias is that "the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (*Id.* at p. 1306.)

■ Limited to the question regarding the applicable test to establish a prima facie case, the United States Supreme Court granted certiorari and in

*Johnson v. California, supra,* 545 U.S. 162 (*Johnson*), held that "California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case." (*Id.* at p. 168 [125 S.Ct. at p. 2416].) The court found the appropriate standard to be that "a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Id.* at p. 170 [125 S.Ct. at p. 2417].)

### b. Jury Selection

The jurors in this case were selected from a panel of 75 potential jurors. Approximately one-third of the panel of 75 had names that would suggest they were Hispanic. At the outset of jury selection, 12 potential jurors were seated in the jury box and another six potential jurors were seated in front of the box. Four of the potential jurors seated in the box and two of the potential jurors in the group of six outside of the box had Hispanic surnames.

The court and counsel questioned the group of 18 potential jurors. The jurors were questioned in the usual manner regarding their knowledge about the case, whether they knew anyone involved in the case, whether they had any preconceived beliefs or biases about the case, whether they would follow the court's instructions, and other general routine questions. Potential Juror No. 4 was excused after she responded that she was a personal friend of one of the witnesses. None of the other potential jurors answered any of the questions in a manner that would indicate a potential problem.

Several of the potential jurors had relatives or in-laws in law enforcement. Several jurors had prior jury experience. Up to this point in jury selection, Potential Jurors Nos. 7, 11 and 12 did not answer any of the questions in an affirmative manner requiring further elucidation. Potential Jurors Nos. 7, 11 and 12 were seated in that order in the jury box.

The potential jurors were asked if they, any family members, or any close friends had been arrested for any offenses. No. 12 stated she had family and acquaintances who have been arrested for driving under the influence, as well as some acquaintances that have been arrested for drugs and weapon possessions. She commented they were treated fairly and there was nothing in those experiences that would make it difficult for her to be fair and impartial to both sides. Other potential jurors had family or friends involved with criminal charges.

The potential jurors were asked if any of them, their family members, their friends, or their acquaintances had been the victims of any crime. Several potential jurors responded to this question, including Nos. 11 and 12. No. 11

stated that he was a victim of identity theft in December of 2003. A person who lived in his apartment complex was arrested for the crime. The court asked if No. 11 followed the case; he said he did not. No. 11 was asked if the arrested individual was convicted; No. 11 did not recall. No. 11 had no complaints about how the matter was handled.

No. 12 said that her godfather's son was murdered a few years back in Arizona. The victim had been stabbed. She recalled that someone was arrested. When asked if justice had been served, she believed so, but she did not really follow up on it. There was nothing about this case that would make it difficult for her to be fair and impartial.

The jurors were each asked to give an individualized statement regarding their marital status, living arrangements, careers, and information about the individuals living in their household.

No. 7 stated: "I've lived in the Kerman area for the last ten years. I've never been married. I'm not married. I have a three-year-old son. I graduated [from] high school and I currently attend business school right now. I've been a security guard for three years and worked in the security business for four. I just spend my time with my son."

No. 11 gave the following personal statement: "I've lived in Fresno for the last five years and Kingsburg the prior five. I am married for the last two years. I have no children. I have a bachelor of science in accounting and studying for my C.P.A. My wife is finishing her master's degree. I've been working in finance and accounting the last eight years, and prior to that I was a student. And my wife is an adjunct professor for a university in town and also an administrator, and she's been doing that for about six, seven years now. There are not any other adults in my home and I typically spend time either traveling for leisure or working on my house."

No. 12 made the following statement: "[F]or the past two years I've been living out in Riverdale. Before that I was living in Gilroy near the Bay area. I am married. I've been married for ten years, no children.

"And my educational background is I finished high school and did about a year of college. My spouse, he only finished elementary school. And during the past ten years I've been working with—as a community health aid[e] and customer service representative before that for about six years. And my spouse, right now he's working on our ranch that we have. And for the past two years, and then before that he worked for Wright Brothers, which is the company that makes barrels, and no other adults in the home. And usually in our leisure time we travel back to the Bay area to visit family."

After the voir dire of the first 18 people was concluded, the People began their peremptory challenges. The People first challenged No. 12. He was replaced with No. 14. Defendant challenged No. 6. No. 6 was replaced with No. 15. No. 15 had a Hispanic name. No. 11 was the next person challenged by the People.

After No. 11 was excused by the People, defendant asked for a sidebar conference. This conference was not recorded. No. 11 was replaced by No. 16. No. 16 had a Hispanic surname.

The challenges resumed with defendant challenging No. 5. No. 5 was replaced with No. 17. The People then challenged No. 7. No. 7 was replaced by No. 18. Defendant and the People then accepted the jury. At this time, three Hispanic persons or persons with Hispanic surnames were seated on the jury. No. 10 was one of the sworn jurors. No. 10 had a Hispanic surname and had remained as one of the original prospective jurors in the box from the outset.

Seven people were questioned for the alternate juror positions. Two of the seven had Hispanic surnames. Neither the People nor defendant made any challenges to the prospective alternate jurors. No. 22, who has a Hispanic surname, and No. 26 were seated as the two alternate jurors.

### c.  Discussion

Defendant contends there are two reasons supporting his argument that the trial court erred in denying his *Batson/Wheeler* motion. First, he argues that at the time of jury selection California's standard for establishing a prima facie case was contrary to the standard now required by the United States Supreme Court. Because the trial court was bound at that time to follow the California standard, defendant asserts that de novo review is appropriate in this appeal.

As previously set forth, the standard for the trial court to apply in determining if a defendant has shown a prima facie case of group bias is now different from the standard that was in effect at the time of defendant's trial. The record is silent as to what standard the court applied in denying the *Batson/Wheeler* motion. The trial court stated, "At that time [the time of the sidebar] the court found that there was no prima facie evidence indicating *Batson-Wheeler* issues."

██ The California Supreme Court has, in several cases, determined *Batson/Wheeler* issues post-*Johnson* in situations similar to what occurred here (the trial was pre-*Johnson* and the record does not demonstrate what standard was used) by conducting its own review of the record. The review

proceeds on the assumption, arguendo, that the trial court's decision is not entitled to deference. The California Supreme Court reviews the record, applies the *Johnson* standard, and resolves the legal question "whether the record supports an inference that the prosecutor excused a juror on the basis of race." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73 [33 Cal.Rptr.3d 1, 117 P.3d 622]; see also *People v. Gray* (2005) 37 Cal.4th 168, 187 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Avila* (2006) 38 Cal.4th 491, 554 [43 Cal.Rptr.3d 1, 133 P.3d 1076].) Accordingly, we apply that same standard of review in this case.

Defendant's second argument is that the prosecution's exercise of three peremptory challenges, all of Hispanic persons, establishes a prima facie case of group bias and requires that we reverse this case for a new trial.

We begin by stating that our review is limited to the prosecutor's challenges to Potential Jurors No. 11 and No. 12. There was only one sidebar conference during jury selection. It occurred immediately following the People's excusal of No. 11, and after the People had previously excused No. 12. The jury was accepted by the People and by defendant with no further sidebar conferences or objections. After the jury was sworn and the alternates were selected, defense counsel stated, "And, Your Honor, before we go off the record, should we discuss that we had an issue of the jurors and the court found that there—" The court responded as previously set forth, "At that time [the time of the sidebar] the court found that there was no prima facie evidence indicating *Batson-Wheeler* issues."

Because defendant did not raise a *Batson/Wheeler* issue regarding the People's challenge to Potential Juror No. 7, we need not consider the challenge to No. 7 in our analysis.

■ Other than the list of names of the prospective jurors and the chart showing the names of the jurors selected to sit on this jury, there is nothing in the record demonstrating ethnicity of the potential jurors, the challenged jurors, or the seated jurors. When making a *Batson/Wheeler* motion the defendant "should make as complete a record of the circumstances as is feasible." (*People v. Wheeler, supra,* 22 Cal.3d at p. 280.) The defendant must also " 'establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.' " (*People v. Morris* (2003) 107 Cal.App.4th 402, 408 [131 Cal.Rptr.2d 872].) Although the record is scant on the above requirements, respondent does not raise this defect in its response to defendant's argument, and therefore we will assume that the requirements of a sufficient record and a cognizable group were met.

In *Johnson,* the defendant was Black and the victim was a 19-month-old White child. After prospective jurors had been removed for cause, 43 eligible jurors remained. Of the 43 remaining prospective jurors, three were Black. After the prosecutor exercised "the second of his three peremptory challenges against the prospective black jurors, defense counsel objected on the ground that the challenge was unconstitutionally based on race." (*Johnson, supra,* 545 U.S. at p. 165 [125 S.Ct. at p. 2414].) The trial judge found that a prima facie case had not been established. The judge warned the prosecutor that " ' "we are very close." ' " (*Ibid.*)

The next day the prosecutor struck the final remaining prospective Black juror and defense counsel made another motion. The trial court did not ask the prosecutor to explain his challenges but instead examined the record and stated that it was convinced the prosecutor's strikes could be justified by race-neutral reasons. (*Johnson, supra,* 545 U.S. at p. 165 [125 S.Ct. at p. 2414].)

After determining that the California courts were applying the wrong standard to determine whether a defendant had made a prima facie case, the *Johnson* court found that a prima facie case had been shown. "In this case the inference of discrimination was sufficient to invoke a comment by the trial judge 'that "we are very close," ' and on review, the California Supreme [Court] acknowledged that 'it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.' [Citation.] Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under *Batson.*" (*Johnson, supra,* 545 U.S. at p. 173 [125 S.Ct. at p. 2419].)

In the case here, there are no comments by the trial court indicating that the People were teetering on the brink of a prima facie case. In addition, numerous Hispanics remained on the panel of prospective jurors.

Defendant places great reliance on *U.S. v. Alanis* (9th Cir. 2003) 335 F.3d 965 to support his position that a statistical analysis of jury selection was sufficient to raise an inference of discriminatory purpose. In *Alanis,* the prosecutor exercised six peremptory challenges. All of the challenges were to men. Defense counsel objected. The court found that the defendant had made a prima facie showing that peremptory challenges had been exercised on the basis of gender. The People were then asked to provide their neutral-based reasoning for doing so. The circuit court held that the trial court erred in not proceeding to the third required step in the process because it failed "to announce a deliberate decision accepting or rejecting the claim of purposeful discrimination." (*Id.* at p. 967.) In reaching this decision the circuit court stated, "The district court properly conducted steps one and two of the three-step *Batson* process after defense counsel's original objection." (*Ibid.*)

*Alanis* does not aid defendant's position because in *Alanis* the district court found a prima facie case; thus the circuit court had no reason to reevaluate that finding on appeal.

Defendant also relies on *Tankleff v. Senkowski* (2d Cir. 1998) 135 F.3d 235. In *Tankleff* the circuit court found that "the fact that the government tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case." (*Id.* at p. 249.) *Tankleff* is easily distinguishable because here numerous Hispanic, or Hispanic-surnamed individuals, remained on the panel, and at the time of the motion two Hispanic potential jurors were in the jury box.

The circumstances here are more akin to the California Supreme Court case of *People v. Gray, supra,* 37 Cal.4th 168. In *Gray,* the defendant claimed the prosecutor "violated his state and federal constitutional rights by using peremptory challenges to excuse two prospective jurors because they were African-American. [Citations.]" (*Id.* at pp. 183–184.) The Supreme Court rejected his claim. "That prospective Jurors R.H. and B.J., both African-Americans, belonged to a cognizable class is not disputed on appeal [citation] nor does either party dispute that the issue was timely raised and the record is as complete as was feasible. Defendant relies on certain facts that, he claims, raise an inference of discriminatory intent. He first contends, '[t]he almost total absence of Black jurors suggests that [Jurors R.H. and B.J.] were improperly excluded.' Defendant overstates the case. The prosecutor excluded one African-American juror from the regular jury, but left another on, and struck one African-American from the panel of alternates, but left another on. As defendant concedes, the regular jury was composed of nine White jurors, one African-American juror, and two Latino jurors. The panel of eight alternate jurors was composed of six White jurors, one African-American, and one Latino juror. After examining 'the totality of the relevant facts' [citation], we conclude the exclusion of two African-American jurors and the retention of two failed to raise an inference of racial discrimination. (*People v. Box* (2000) 23 Cal.4th 1153, 1188–1189 [99 Cal.Rptr.2d 69, 5 P.3d 130] [that all excluded jurors were African-American is not necessarily dispositive in establishing a prima facie case]; *People v. Davenport* [(1995)] 11 Cal.4th [1171, 1201 [47 Cal.Rptr.2d 800, 906 P.2d 1068]] [showing that 'three of the six challenged prospective jurors had Hispanic surnames' was 'insufficient'].)

"Defendant also argues the prosecutor's decision to excuse two of the six African-Americans in the venire of itself suggests bias. When the prosecutor challenged Juror R.H., of course, that juror was only one of three peremptory challenges the prosecutor had thus far exercised. The trial court did not know whether the prosecutor would remove additional racial minorities from the jury. Moreover, as noted *ante,* although the prosecutor eventually challenged

and had removed from the panel a total of two African-Americans, two more remained. We conclude the removal of two African-American jurors in these circumstances failed to raise a reasonable inference of racial discrimination. (See *People v. Snow* (1987) 44 Cal.3d 216, 225 [242 Cal.Rptr. 477, 746 P.2d 452] [that the prosecutor accepted a jury containing minorities 'may be an indication of the prosecutor's good faith in exercising his peremptories, and may be an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection, [although] it is not a *conclusive* factor'].)" (*People v. Gray, supra*, 37 Cal.4th at pp. 187–188, fn. omitted.)

■ The statistical circumstances of the prosecution's peremptory challenges here was not sufficient to raise an inference of discriminatory purpose.[1]

## II. Use of Juvenile Finding to Support a Strike

Defendant admitted that he suffered two strikes as a result of two juvenile adjudications for robbery in 1993. As a result, he received a term of 25 years to life (plus two years for a weapon enhancement) for his carjacking conviction.

Defendant claims that the use of his juvenile adjudications as prior convictions for purposes of the three strikes law violates his right to a jury trial under the federal Constitution. Defendant relies on *U.S. v. Tighe* (9th Cir. 2001) 266 F.3d 1187 to support his argument. He acknowledges that numerous Courts of Appeal have rejected the *Tighe* analysis but contends that they are incorrectly decided.

■ We agree with the analysis in *People v. Superior Court (Andrades)* (2003) 113 Cal.App.4th 817 [7 Cal.Rptr.3d 74] and the cases that preceded it finding that "a prior juvenile adjudication may constitutionally be used as a 'strike' despite the fact that there is no right to a jury trial in juvenile proceedings." (*Id.* at p. 834.)

---

[1] Defendant contends that comparative analysis is a tool that may be used on appeal to determine if a defendant has made out a prima facie case, regardless of whether such analysis occurred in the trial court. The California Supreme Court has not determined this issue. (See *People v. Cornwell, supra*, 37 Cal.4th at p. 71; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970 [47 Cal.Rptr.3d 467, 140 P.3d 775].) Defendant does not attempt a comparative analysis on appeal; we therefore need not resolve this question.

### Disposition

The judgment is affirmed.

Cornell, J., and Gomes, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 13, 2006, S147720.